STATE, Respondent, v. DOUGLAS, Appellant

(16 N. W.2d 489.)

(File No. 8594. Opinion filed November 20, 1944.)

**Van Slyke & Agor,** of Aberdeen, for Appellant.

**Elmer Thurow,** State's Atty., of Aberdeen, and **George T. Mickelson,** Atty. Gen., and **E. D. Barron,** Asst. Atty Gen., for Respondent.

BAKEWELL, Circuit Judge. The defendant, William G. Douglas, the then State Treasurer of this State, was prosecuted and tried in the Circuit Court of Brown County on an information containing four separate counts, of which counts 1, 2 and 4 charged a violation of SDC 55.9917 and count 3 was grounded on SDC 55.2304. He was acquitted as to count 2, but convicted as to counts 1, 3 and 4 and sentenced to pay fines aggregating $5,000 and to serve a total of five years in the penitentiary, from which judgment of conviction he has appealed.

Count 1 of the information charges in substance that defendant on April 14th, 1940, being then and there the State Treasurer of this state, used $302,791.58 of state funds in his custody to purchase certain South Dakota internal improvement bonds which were outstanding obligations of the state and of a par value of $260,000 from the Clarence J. Burns Company, and that this company and one Phill T. Burns in consideration of such purchase paid to defendant the sum of $1,000 in money and thereby defendant made a profit out of state money of which he had custody.

Counts 2 and 4 relate respectively to the purchase on May 26th, 1940, of South Dakota internal improvement bonds of the par value of $200,000 from the Burns Company for $233,799.77 and a repayment to defendant of $500 and the purchase on July 10th, 1939, of soldiers' compensation bonds of the par value of $70,000 from the Clarence J. Burns Company for $79,000.38 and a repayment to and resulting profit for defendant of $51.10.

Count 3 relates to the same $51.10 which defendant is charged in count 4 with having received from the Clarence J. Burns Company and Phill T. Burns as a profit from the use of state funds in his custody, but here he is charged with having received it for the performance of a duty of his office in the registration of the $70,000 of soldiers' compensation bonds referred to in count 4.

The prosecution resulted from a series of transactions between the defendant in his official capacity and one Phill T. Burns, vice president of the Clarence J. Burns Company, a corporation, engaged in the bond brokerage business at Aberdeen, South Dakota. The details of these transactions as developed at the trial and as they relate to counts 1 and 2 of the information are substantially as follows:

The defendant became State Treasurer on January 1st, 1939. When he entered upon the duties of his office the State of South Dakota had outstanding certain bond issues, to-wit: Soldiers' bonus, rural credit and internal improvement bonds. His predecessor in office had inaugurated the practice of using money as it accumulated in the several bond sinking funds for the purchase of such of these several outstanding unmatured obligations of the state as could be advantageously acquired. This practice was continued by the defendant and its legality and propriety as a profitable and proper investment is not here questioned. The mechanics of the purchase of these bonds which had been set up by defendant's predecessor and which was followed by the defendant was to buy these bonds from such banks, bond houses and brokers as had acquired them for resale. The evidence shows the purchase of bonds by both the defendant and his predecessor in office to have been made through a large number of banks, brokers and investment houses in Minneapolis, St. Paul, Chicago, Omaha, Sioux City and elsewhere, including the firm of Clarence J. Burns Company of Aberdeen, South Dakota. The purchase price of all the bonds so purchased was paid by treasurer's crecks issued by the defendant and the evidence discloses that total purchases of bonds were made by the defendant from the Clarence J. Burns Company to the amount of slightly less than $2,300,000. In April, 1941, Phill T. Burns agreed to sell defendant $15,000 of Rural Credit

Bonds for $15,421 and sent defendant an invoice for these bonds on that basis. Defendant thereupon sent a check to Burns for the amount of the invoice and followed this with a further remittance of $27,000 for the purchase of still another bond issue which, however, Burns failed to deliver. This latter amount, after long delay, was finally recovered by defendant from Burns, but the $15,000 of Rural Credit Bonds were not forthcoming. It then developed that Burns had used the purchase money of the latter issue in speculation in the stock market and was unable either to repay it or to deliver the bonds. Upon learning this the defendant brought the matter to the attention of the Attorney General's office. with the result that Burns was charged with embezzlement and tried thereon in Brown County. At the trial Burns made charges of wrongdoing against the defendant and other state officers, claiming that such officers had, in concert with each other and with him, divided a profit arising from a certain bond transaction had in June 1939. The prosecution of Burns for embezzlement resulted in a directed verdice on his motion for acquittal and this was immediately followed by the arrest and trial of this defendant and the other state officers so incriminated, and incidentally, of Phill T. Burns. To this charge Burns immediately plead guilty while the other defendants stood trial and were acquitted. Defendant was then charged with the offenses which are the subject of this prosecution and Burns, who had not yet been sentenced and was free on bail, appeared in the role of star witness for the state. He testified that some time shortly after defendant took office he called upon defendant and solicited a continuation of the patronage he had enjoyed with defendant's predecessor during his tenure of office. He fixed this conversation as having occurred in June or July of 1939. Although denied by defendant, Burns testified that in this conversation he told the defendant Douglas that he would try to protect him for 30% of anything he made on any business given him by Douglas. He further testified that after he promised to pay defendant this 30% of his profits he purchased the South Dakota internal improvement bonds described in count 1 of the information for $299,794.30 and immediately thereafter resold them to defendant as State Treasurer for $302,791.58.

for which he received a treasurer's check. He further testifies that thereafter and on or about April 12th, 1940, he placed $1,000 in currency in an envelope and then in company with one Pete Schneider, an employee of the Burns Company, drove from his office in Aberdeen to Pierre where he contacted defendant in his office. He then relates that he, with Schneider and the defendant, left the Treasurer's office in the capitol building and entered witness's automobile in which they then drove to defendant's residence. Here the witness testifies he handed the envelope in which he says was contained the $1,000 to defendant. The witness Schneider corroborated Burns as to the trip from Aberdeen to Pierre and as to Burns having handed the envelope to defendant, but says that he does not know what was contained in the envelope. Defendant says there was only $40 in the envelope, but admits that this $40 together with $150 in June, 1939, $50 in August, 1939, $50 at Christmas time in 1939 and another $50 in October, 1940, were paid to him by Phill T. Burns as contributions to his campaign fund and as a Christmas present and in this respect defendant's testimony is not disputed by the witness Burns or otherwise.

The offenses charged are not grounded on the fact that defendant expended state funds in purchasing these obligations, in excess of his official power, nor that the purchase price thereof was excessive, but only that in connection with the use of such funds he made a profit for himself in violation of the Constitution and laws of this state.

The Constitution, Art. XI, Sec. 11, provides: "The making of profit, directly or indirectly, out of state, county, city, town or school district money, or using the same for any purpose not authorized by law, shall be deemed a felony and shall be punished as provided by law."

The statute involved is SDC 55.9917, which is as follows: "The making of profit, directly or indirectly, by the State Treasurer, out of any money in the State Treasury belonging to the state, with the custody of which the State Treasurer is charged, by loaning or otherwise using it, or the removal by the State Treasurer, or by his consent, of such money or any part thereof, out of the vault or safe of the Treasurer's Department, or out of any legal depository of

such money, except for the payment of the sums authorized by law to be paid, for the purpose of depositing the same, under the provisions of chapter 55..24, in banks which shall have qualified as depositories, shall constitute a felony, and upon conviction thereof, shall subject the Treasurer to imprisonment in the State Penitentiary for a term not exceeding two years or a fine not exceeding five thousand dollars, or to both such fine and imprisonment, and the Treasurer shall be liable upon his official bond for all profits realized from such unlawful use of such funds."

This statute had its inception as Chap. 229, Laws of 1909, where it appears as Sec. 10. This act creates a State Board of Finance in much detail provides for the designation by such board of public depositories for state funds, for interest thereon computed on daily balances to be payable to the state and for the bonding of such depositories. It specifically provides that the Treasurer shall not be liable for the loss of funds through the failure or insolvency of any qualified depository, and minutely specifies the duties of the Treasurer as to the funds which should come into his official custody. It requires that within three days after receiving any money he shall deposit the same in one or more of the previously designated depositories. After providing that it shall be a felony for the Treasurer to make a profit out of any money in the treasury by loaning or otherwise using the same, it also makes it a felony for him to remove it from the vault or safe in his office or out of any legal depository, except for the payment of sums authorized by law to be paid, or for the purpose of depositing it in qualified depositories. It further denominates as a felony the offering or giving of any gift, compensation, reward or inducement to the Treasurer or to any member of the State Board of Finance to procure the deposit of any of the state moneys in any bank contrary to the provisions thereof. It requires a monthly sworn statement from each depository to the effect that, except for the interest credited to the state, neither the depository nor any officer or agent thereof has paid or promised to pay any money, credit or other benefit to the Treasurer, or to any other person as a consideration for the deposit in such depository of any state moneys. The act concludes with the

requirement that: "The state treasurer shall account to the state for all moneys and funds directly or indirectly received by him by virtue of his office, or as interest or compensation for the use, deposit or forbearance of any state moneys in his hands or under his control." § 18.

It is apparent that this statute was a legislative response to the constitutional mandate, rendering effective prohibitions which had for twenty years been inoperative because no penalty for their violation had been prescribed. The Legislature had previously by Chap. 104, Session Laws of 1897, prohibited the County Treasurer from making a profit out of funds in his custody: "By loaning or depositing or otherwise using or depositing the same in any manner", § 4, and declared that he should be liable on his official bond "for the profits realized by such unlawful using of such funds", but as to the State Treasurer no such restriction was imposed until this statute was passed in 1909.

In 1917 this Court in the case of State v. Schamber, 39 S. D. 492, 165 N. W. 241, 244, L. R. A. 1918B, 803, considered the question of the liability of Mr. Schamber who had served as State Treasurer for a term of two years commencing in 1899 and held that since the legal title to the funds in his official custody did not pass to him but remained in the State, he was liable to account for interest received thereon from banks wherein he had deposited the same.

There we considered the effect of Chap. 104, Laws of 1897, and said: "During the same session of the Legislature there was enacted a statute (Chap. 104 Laws of 1897) which, among other things, enacted as a part of our statutory law the provisions of section 11, art. 11 (of our Constitution), rendering them applicable to county treasurers only."

This is the only interpretation of the 1897 statute by this Court and while perhaps only obiter dicta bears we think on the construction to be given the 1909 statute. There is to be sure some difference in the 1897 statute relating to County Treasurers and the 1909 law as to the State Treasurer. This is due to the inclusion in the earlier statute of the words "depositing" following the words "loaning" and "otherwise using" respectively, but this is a distinction with-

out a difference. The purpose of both was to insure that any interest realized from public moneys should go to the state or county as the case might be rather than to the Treasurer. Nebraska has a statute identical with our 1897 statute, but applicable there to the State Treasurer. The Supreme Court of Nebraska construes their statute by saying: "Prior to the adoption of the present statute, there existed in this state no law authorizing or requiring the deposit of public funds in banks. It was, however, generally understood that each of the former state treasurers had loaned the state funds to various banking institutions of the state for his own pecuniary benefit. The state received no income from such use of its money, and it was to remedy this that the depository law was enacted, rather than to provide for the safe-keeping of the moneys belonging to .the state treasury. The clear and manifest object of the statute was to enable the state to receive interest on its funds deposited in banks." State v. Bartley, State Treasurer, 39 Neb. 353, 58 N. W. 172, 177, 23 L. R. A. 67.

That this was likewise the purpose and object of the statutes of 1897 and 1909 seems evident. Both have the same general plan, which is to establish a system of operation in the Treasurer's office, which, if followed, compels the immediate deposit of the funds in qualified public depositories, thereby preventing their use by the Treasurer for his own profit.

█ In view of this constitutional and legislative background and the contemporaneous history of similar legislation in other states, which is rather extensively collated in State v. Schamber, supra, and the authorities therein cited, we are of opinion that SDC 55.9917 and the setting in which it originally entered our statute law, was designed to remove the uncertainty previously existing as to his right to appropriate to his own use and resulting profit, funds belonging to the public and to enact in statutory form the provisions of Art. XI, Sec. 11, of the Constitution.

█ The meaning of statutory terms depends on the connection in which they are used and in the interpretation thereof the doctrine of construction noscitur a sociis prevails.

50 Am. Jur. 241, § 247. Where any particular word is obscure or of doubtful meaning, taken by itself, its obscurity or doubt may be removed by reference to associated words and the meaning of a term may be enlarged or restrained by reference to the whole clause in which it is used. State of Virginia v. State of Tennessee, 148 U. S. 503, 13 S. Ct 728, 37 L. Ed. 537.

■ The purpose of the statute is to be gathered from the whole act. In determining such purpose resort may be had not only to the context but to the structure and scheme of the act, and in some cases to its historical background or legislative history. 50 Am. Jur. 293, § 306.

■ The meaning of the word "loan" is plain. A loan of money is the delivery by one party and the receipt by the other party of a given sum of money upon an agreement, express or implied, to repay the sum loaned with or without interest. 38 C. J. 128, § 8; State v. Central Purchasing Co., 118 Neb. 383, 225 N. W. 46, 48; Citizens Bank of Waynesboro v. Mobley, 166 Ga. 543, 144 S. E. 119, 58 A. L. R. 1383.

If the statute is ambiguous the uncertainty springs from the use of the words "otherwise using" as applied to the funds. Here the word is used in conjunction with "loaning" so that the phrase in question reads "loaning or otherwise using". To loan money of another without legal authority is to exercise over the money loaned a proprietary function. For the Treasurer to loan state funds without statutory permission would be for him to exercise over them a dominion inconsistent with the ownership and title of the state thereto. The same would be true if he "used" them for his own profit and advantage. In fact from the standpoint of the state the result of loaning the money to some one else and using it for his own private purposes would be identical. Both would be the personal use of the money as distinguished from an official or public use, but if we construe "otherwise using" as referring to the authorized, lawful, and proper use of the money—the use of it which the law contemplates and which is within the power and as well the duty of the State Treasurer—we ascribe to the word and phrase of which it is a part a meaning and implication exactly opposite to that

which must be accorded to the word "loaning", the meaning and purport of which leaves no room for uncertainty.

The words "use" and "using" have been the subject of frequent judicial definition. In the case of State v. Stockwell, 23 N. D. 70, 134 N. W. 767, 772, the Court said: " * * * we find the words 'use,' and 'to be used,' must be construed with the context. As an instance, such terms in insurance law mean occupancy. In real estate transfers and the interpretation of wills and devises the word 'use' often is interpreted as a trust. While in ordinary language to 'use' is to employ, to derive service from; to 'use' moneys is to pay out or disburse them. In Hightower v. State, 72 Ga. 482, the term is exemplified as 'one may "use" a thing that is employed in his service or business.' Again in Heaston v. Board, 20 Ind. 398, at page 403, we read: 'The word "use" may be held as synonymous with "benefit." ' Again, under statutes regulating United States customs duties on personal property imported, in Astor v. Collector of Port of New York, 111 U. S. 202, 4 S. Ct. 413, 28 L. Ed. 401, we find: 'In "use" is defined to be in employment.' 'Out of "use" is defined as "not in employment." ' ' "To make use of" is defined as "to put in use," "to employ," "to derive benefit from." ' Again in State v. Davis, 9 Houst. (Del.) 558, at page 561, 33 A. 439, at page 440, the opinion uses the following language: 'The word "use" means to make use of, to convert to one's own service, to avail one's self of, to employ, to put to a purpose.' "

One of the most common meanings of the word "use" as a noun is defined by Webster as "usefulness", "utility", "advantage", "Production of profit". Olmstead v. Camp, 33 Conn. 532, 89 Am. Dec. 221; State v. Millar, 21 Okl. 448, 96 P .747, 753; National Surety Co. v. Jarrett, 95 W. Va. 420, 121 S. E. 291, 36 A. L. R. 1171.

In State v. Brooks, 85 Iowa 366, 52 N. W. 240, 242, in considering the sufficiency of a Court's instruction under a statute defining larceny by embezzlement, the Court held that the addition of the words "and benefit" to the word "use", though not in the statute, did not enlarge the meaning of an instruction based thereon, saying: "It would not be understood differently from what it would have been had the words 'and benefit' been omitted."

In Smith v. Cameron, 106 Or. 1, 210 P. 716, 720, 27 A. L. R. 510, the Court said: "Lexicographers give to the word 'use' a primary and a secondary meaning. On the one hand, the word 'use' may signify: 'The act of employing anything, or the state of being employed; employment, application; conversion to a purpose, especially a profitable purpose.' On the other hand, it may mean 'that property of a thing which renders it suitable for a purpose; adaptability to the attainment of an end; usefulness; availability; utility; serviceableness; service; convenience; help; profit; as, a thing of no use.' " citing Century Dictionary, Rev. Ed.

The Court further said: "There are two main lines of judicial decisions; One, holding that the word 'use' is to be taken in its primary sense, and that when so taken it means, stated briefly, 'employment;' the other holding that the word should be given its secondary meaning, and that, when so applied, it means, stated briefly, 'advantage.' * * * Under the authority of that line of decisions which gives to the word 'use' its secondary meaning, some courts have gone to the extent of holding that 'public use' is synonymous with 'public benefit,' 'public utility,' or 'public advantage.' "

■ The word "otherwise" appearing as "otherwise using it" is a general term under the ejusdem generis rule as applied to the interpretation of statutes. A "cleanup phrase" such as the term "otherwise" with respect to a classification which immediately precedes it includes "only things of a like or similar kind, and nothing of a higher class than that which it immediately follows." Hodgson v. Mountain & Gulf Oil Co., D. C., 397 F. 269, 272.

In Myers v. Seaberger, 45 Ohio St. 232, 12 N. E. 796, 798, the phrase "or otherwise controlled by him" in a statute requiring the listing for taxation of "all moneys invested, loaned, or otherwise controlled by him, as agent or attorney, or on account of any other person or persons", must be construed to mean controlled in a manner similar to the loaning and investing of money. In a statute prohibiting the selling, giving or otherwise disposing of intoxicating liquors without a license, the words "or otherwise dispose of" must be construed to refer to a disposition of the same class as a sale or gift. Roberson v. State, 100 Ala. 37, 14 So. 554, 555.

"Otherwise improve" following the words "to open, widen, and extend" a street refers only to such improvements as are like opening and widening and must be limited to the preceding language of the section. Methodist Episcopal Church v. City of Wyandotte, 31 Kan. 721, 3 P. 527, 530.

General and specific words in a statute which are associated together and which are capable of an analogous meaning take color from each other so that the general words are restricted to a sense analogous to the less general. The general words are deemed to have been used not to the wide extent which they might bear if standing alone, but as related to words of more definite and particular meaning with which they are associated. The term "otherwise" when preceded by a specific enumeration is commonly given a restricted meaning and limited to articles of the same nature as those previously described. 50 Am. Jur. 244-246, and cases thereunder cited.

It seems clear to us that what the statute means is only to forbid the same two things which the Constitution prohibits, namely, (1) the making of personal profit out of public funds and (2) the use of such funds for any purpose not authorized by law. This the state has done by erecting such obstacles to the Treasurer's retention of the immediate physical possession of the actual money which comes into his possession as practically prevents his personal use of the same. Hence, the provisions found in the statute compelling the Treasurer to deposit all moneys within three days after receiving it and then to keep it on deposit until it is paid out as authorized by law. To further insure its safety and as well its production of interest for the state, the Treasurer is forbidden to loan it out or use it himself and he commits a felony if he does so. But the use of it which is prohibited is a personal use not authorized by law and not its use in the discharge of his official duty and in exercise of his power to use and expend it for the payment of sums authorized by law to be paid. The statute is penal in character, designed to prevent and punish a crime. If the crime is the personal use and enjoyment of state money, the punishment is there and not elsewhere in our statutes provided for. If the use referred to is public, the contrary is true, for

if through the official use of the funds of his office the Treasurer acquires any money, fee, emolument or perquisite, our statutes on embezzlement, which were fully applicable to the State Treasurer when SDC 55.9917 was adopted, would supply the vehicle for his prosecution. Of these, SDC 13.1111 makes it a misdemeanor for any executive officer to "ask or receive any emolument, gratuity, or reward * * * for doing any official act * * . * ". SDC 55.2304 makes it a felony for any state officer receiving a salary to keep or retain any "money, emolument, fee, or perquisite, paid to or received by him" for any duty connected with his office. When the statute under consideration was passed we also had our present statute, SDC 13.1107, defining the bribery of an executive or administrative officer as a felony, and SDC 13.1108, which makes it a felony for such officer to "ask, receive or agree to receive any bribe upon any agreement or understanding that his * * * action upon any matter then pending, or which by law might be brought before him in his official capacity, shall be influenced thereby." A bribe is anything of value; any gift, advantage or emolument; any price, reward, gift or favor. 5 Words and Phrases, Perm. Ed. p. 789. This brings us to a consideration of the charge against this defendant under count 1 of the information. It is the contention of the state, and there is at least some testimony to support it, that prior to the purchase of the bonds in question there was a prearrangement between defendant and Phill T. Burns for a division of Burns' profit thereon, which was followed by the actual division agreed upon. Assuming these to be the facts, we think the purchase of the bonds described in count 1 was such a use of the funds expended in the purchase as is forbidden by the statute and the Constitution. This, as we view it in the light of both, is what the law forbids: If prior to or at the time of making an expenditure of public moneys in payment of a sum authorized by law to be paid, the Treasurer forms the intent to make a profit for himself by appropriating to his own use any part of the funds so disbursed, the expenditure is a use of such funds not authorized by law. If a profit actually inures to him as the result of such a transaction the use is a felony. The intent, design and scheme to

profit by the use of the funds in his custody being unlawful and felonious, the use itself is likewise felonious and constitutes a personal as distinguished from an official use of such funds and as such is the use forbidden by SDC 55.9917 and by Art. XI, Sec. 11 of the Constitution, and this is true even though the object and purpose of the expenditure would have been a lawful one were it not tainted with the profit motive.

■ But where the element of intent of profit making is not present when the expenditure is made, the use of the money expended can by no sophistry be deemed a personal rather than an official use, or an unauthorized rather than an authorized use, even though as a consequence of the expenditure, a profit in the form of a gift, contribution or gratuity is subsequently realized by the Treasurer, as defendant claims was the situation in this case.

The learned trial Court, after instructing the jury that the bond purchases were in themselves entirely lawful, further instructed them that: "While the defendant denied 'splitting commissions' with Phill Burns, and has denied the making of any personal profit arising from the transactions set forth in Counts 1 and 2 of the information, he admitted accepting from said Burns what the defendant designates as 'campaign contributions' and a Christmas present. In this connection you are instructed that what the statute and Constitution prohibits is the making of personal profit by the State Treasurer as a consequence of the performance by him of any official duty. Any gift of money or any contribution to a campaign fund which was given to or received by the defendant as a consequence of the performance by him of any official act or duty would be the making of a personal profit within the meaning of the law. And therefore if you find that the defendant, on or about April 14, 1940 made a personal profit by receiving and accepting from Phill T. Burns anything of value, whether denominated a gift, a campaign contribution or otherwise, as a consequence for the purchasing of the bonds described in Count 1 of the information, it would be your duty to find the defendant guilty as to said Count.

"The same principles of law apply as to Count 2 of the information."

The offense here defined is not the offense charged in the information, but one distinctly different, for while the information charges that defendant made a profit out of money of the state in his custody, the Court instructed that if defendant as a consequence of the bond purchase received any money as a campaign contribution or otherwise the jury should convict the defendant on count 1. In fact the instruction goes even further since it interprets both the constitutional and statutory provisions as prohibiting the making of personal profit by the State Treasurer "as a consequence" of the performance of "any official duty" and further advises the jury that "any gift of money or any contribution to a campaign fund given to or received by defendant as such Treasurer as a consequence of the performance by him of any official duty, would be the making of a personal profit within the meaning of the law". This instruction in practical effect is that even if defendant had no arrangement or agreement with Burns for a division of commissions or profits on this bond transaction, either prior or subsequent to its final completion, and no intention or willingness to share therein, he would be guilty as charged if at any time subsequent to the transaction Burns gave him a Christmas present or a contribution to his campaign fund. This instruction is palpably erroneous in several respects. Neither the Constitution nor the statute in question makes it an offense for the Treasurer to profit by the performance of "any official duty", but only by the use of state funds. Neither does the Constitution or the statute make it a felony for the State Treasurer to profit as a consequence of the use of such funds, but only to make a profit "out of the personal or private use" of such funds. There is a marked distinction between making a profit out of state funds and making a profit as a consequence of using state funds. "Consequence" is defined by Webster as: that which follows something on which it depends; that which is produced by a cause; a result. And this generally is the meaning accorded it judicially. Munroe v. Hartford Street Ry. Co., 76 Conn. 201, 56 A. 498; Kelsey v. Rebuzzini, 87 Conn. 556, 89 A. 170. 52 L. R. A., N. S., 103; Hill v. Day, 9

W. W. Harr. 400, Del., 199 A. 920; In re Benson, 178 Okl. 299, 62 P. 2d 962.

The use then of the word "consequence" in this instruction was to advise the jury that if the cause of Burns' gifts to defendant was the bond purchase and the gift was the consequence resulting from such cause, the defendant would be guilty. Aside from the fact that the failure of the Court to advise the jury that to render defendant guilty any profit he derived must be out of the personal and private use of public funds and not merely as the consequence of the official use thereof, the instruction is erroneous and prejudicial to the defendant, in that it assumes that the cause which prompted Burns to make the gift or contribution was the same cause which actuated the defendant to accept it and this assumption is not logically tenable. The theory of cause and effect, or otherwise stated, cause and consequence as used in this instruction, as applied to the facts here involved relates to Burns rather than to the defendant. Two isolated facts stand undisputed in the evidence. One is that there was a transaction in which defendant purchased bonds from Burns. The second is that Burns paid certain sums of money to defendant which may or may not have been lawful, depending on the circumstances under which the payment was made. To sustain a conviction these two isolated facts must be connected together by evidence showing more than merely cause and consequence. If, as the state charged, the payment was made in the division of Burns' profit and made in consummation of a pre-arrangement wherein the minds of both Burns and the defendant met and agreed that defendant should share in Burns' profit on the transaction, the defendant would be guilty because he knowingly and intentionally used the money of the state to make a personal profit for himself. Evidence of this would link together the two isolated facts to prove the crime. This would be true regardless of the amount paid or whether the full amount due defendant under the agreement, or a different amount, was actually received by defendant. If, on the other hand, the money received by defendant was not the result of a profit sharing agreement made before the bonds were purchased, but was a mere voluntary contribution from Burns which he had not

previously contracted or agreed to pay as a consideration for the bond purchase, defendant would not be guilty of the offense charged in the information. And this notwithstanding that the motive which prompted Burns to make the payment may have been gratitude resulting from or as a consequence of defendant's purchase of the bonds in question. The evidence shows purchases by defendant from Burns and his company of bonds to the amount of nearly $2,300,000, on which the Burns company doubtless realized a considerable profit. This profit was a consequence and result, at least to some extent, of the good-will of the defendant Douglas, who was an elective state officer whose term as such would expire on January 1st, 1940, unless he should be re-elected in 1940. That Burns was desirous of Mr. Douglas' re-election is but natural. That he should contribute a matter of some $340 to his campaign fund and give him $50 as a Christmas present is quite understandable. Under all the evidence in this case the jury would be justified in believing that Burns' gifts and contributions were the consequence of either the bond purchase described in count 1 of the information or some other purchase or purchases for this seems the apparent and indisputable fact.

 Defendant was indiscreet and unwise in accepting campaign contributions and presents from Phill T. Burns or from anyone else with whom he was transacting state business. The possibility that he was venal cannot be denied, but until there is some evidence showing his guilt he must be deemed innocent. Proof that he received such contributions and gifts does not establish his guilt on the charge of making a profit by the use of state funds. The Court's instruction was highly prejudicial to the defendant and an erroneous statement of the law.

What we have said as to count 1 applies with equal force to count 4, for here the undisputed evidence discloses that the purchase of the bonds involved in this count was not preceded by any understanding or agreement by which a profit was to be realized by defendant. The money he received for the expense of his trip to Minneapolis to register the bonds was paid to him after the same were purchased

and there is no evidence of any pre-arrangement whatever for any profit for defendant.

The defendant assigns as error the refusal of the trial Court to instruct the jury that the witness Burns was an accomplice and that a conviction could not be had upon his testimony unless such testimony was corroborated by other evidence tending to connect defendant with the commission of the offense.

SDC 34.3636 provides: "A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof."

SDC 13.0203 provides: "All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense or aid and abet in its commission, though not present, are principals. All persons who, after the commission of any felony, conceal or aid the offender with knowledge that he has committed a felony and with intent that he may avoid or escape from arrest, trial, conviction, or punishment, are accessories. There are no accessories to misdemeanors."

 Burns appears to have been the prime mover in the transaction for the purchase of the bonds described in counts 1, 2 and 4 in connection with the purchase of which defendant is charged with having made a profit out of the use of state funds. If Burns' testimony is to be believed, he it was who offered defendant a division of his profits and paid over the money. Without his active participation the alleged crime could not have been completed. It is true that the actual crime for which defendant was on trial was one which could not be committed by Burns himself because he was not the State Treasurer, but he could be and was concerned in and aided and abetted in its commission. Therefore he was a principal under SDC 13.0203. In State v. Phillips, 18 S. D. 1, 98 N. W. 171, 173, 5 Ann. Cas. 760, an accomplice is defined as: " 'One who knowingly, voluntarily and with common intent with the principal offender, unites in the commission of the crime. *. * * To render him such, he

must in some manner aid or assist or participate in the criminal act, and by that connection he becomes equally involved in guilt with the other party by reason of the criminal transaction.'"

The rule is stated in 14 Am. Jur. 819, § 73, as follows: "There are some offenses which are so defined by statute or by the common law that they may be committed only by certain persons or classes of persons. Nevertheless, with few exceptions, a person who is not within the class of those by whom the crime may be directly perpetrated may, by aiding and abetting a person who is within the scope of the definition, render himself criminally liable."

In State v. Johnson et al., 50 S. D. 394, 210 N. W. 353, the offense involved was a misapplication of funds of a bank by an officer thereof. Cozad, who was not an officer of the bank, was jointly indicted with Johnson, the president thereof, and charged with having assisted Johnson to misapply the funds in question. On Cozad's separate demurrer to the indictment we held him to be a principal.

This decision is in line with the great weight of authority. Annotations in 5 A. L. R. 782, 74 A. L. R. 1110, 131 A. L. R. 1322 and 16 Ann. Cas. 467.

■ The trial Court refused to give an instruction requested by defendant, which is as follows: "You are instructed that if the testimony of Phill T. Burns relating to Counts I and II is true, then Phill T. Burns is what is known as an 'accomplice', and you are instructed that you should examine his testimony with great care and caution, before you accept it as true." And likewise refused to give to the jury another instruction requested by defendant to the effect that if Burns' testimony is true he is an accomplice and correctly defining that term as well as the necessity for and sufficiency of the corroboration of his testimony in order to support conviction under counts 1 and 2 of the information.

These were proper instructions under the testimony in this case. Without proof that there was an agreement between defendant and the witness Burns to divide the latter's profit on this bond transaction and also proof that a profit actually resulted to defendant by reason thereof, he could

not be convicted. The only testimony that any such agreement was ever entered into or any conversation had between the defendant and the witness Burns relative thereto was the testimony of Burns himself. Defendant denies both the conversation and the offer, and there is no other evidence relating thereto. As to the payment, Burns claims to have made of $1,000, his testimony has no corroboration. Pete Schneider saw him deliver the envelope, but does not know what was in it. Defendant admits receiving the envelope but says there was but $40 in it.

■■■ At common law an accomplice is a competent witness and his testimony, although entirely without corroboration, will support a verdict of conviction. See Monographic note to Commonwealth v. Price, 10 Gray 472, 71 Am. Dec. 668.

■■■ At common law it was not required that the Court give a cautionary instruction that such testimony should be examined with great care and caution, but the practice of giving such instructions or advice to the jury rested in the Court, and his refusal to do so is not assignable as error. In the case of State v. Haney, 19 N. C. 390 (referred to in note in 98 Am. St. Rep. p. 164) it was said that: "No one can require of the judge to give an instruction to the jury, except on the law of the case. The judge may caution them against reposing hasty confidence in the testimony of an accomplice. It is usual—justifiable—and, we add, it is proper to do so, where he has cause to apprehend that the jury may feel themselves bound to find a verdict conforming to the positive testimony of the witness, without weighing the circumstances of suspicion and distrust under which his testimony is rendered. Long usage, sanctioned by deliberate judicial approbation, has given to this ordinary caution a precision which makes it approach to a rule of law."

In Commonwealth v. Wilson, 152 Mass. 12, 25 N. E. 16, 17, Mr. Justice Field expressed the common law rule by saying: "An accomplice is a competent witness for the prosecution in a criminal case, and a jury may find a defendant guilty upon the uncorroborated testimony of an accomplice. It is, however, a general rule of practice to advise a jury

not to convict upon the uncorroborated testimony of an accomplice, but it is not a rule of law, and it is not an error in law, for the presiding justice to refuse so to advise the jury.

 He is a competent witness under our statute, but SDC 34.3636 changes the common law rule which permitted conviction on the uncorroborated testimony of such accomplice, by prohibiting such conviction. This statute crystalized in a rule of positive law what was already a rule of practice which courts regarded themselves as bound to observe, for it has long been the practice both in England and America for the Court not only to caution the jury as to the danger of acting upon the unsupported testimony of an accomplice, and to advise them not to convict unless there is some corroborative evidence.

 While the decisions under the statute are not free from confusion and it is said that the law has been thought not free from doubt and embarassment as to the absolute duty of the trial Court to so instruct and as to whether failure to do so is reversible error, People v. Clough, 73 Cal. 348, 15 P. 5; Commonwealth v. Savory, 64 Mass. 535, 10 Cush. 535, we think that the weight of authority in states whose statute is like ours is that at least where such instruction is requested it is reversible error to refuse it in any case where the testimony of the accomplice is necessary to establish facts essential to defendant's guilt. Territory v. Bannigan, 1 Dak. 451, Reprint p. 432, 46 N. W. 597; Cornell v. State, 138 Neb. 708, 294 N. W. 851; State v. Soltau, 212 Minn. 20, 2 N. W.2d 155; McKinney v. State, 20 Okl. Cr. 134, 201 P. 673; People v. Sternberg, 111 Cal. 11, 43 P. 201; People v. Swoape, 75 Cal. App. 404, 242 P. 1067; People v. Sapp, 282 Ill. 51, 118 N. E. 416; State v. Williams, Mo. App., 266 S. W. 484; State v. Clay, 220 Iowa 1191, 264 N. W. 77; O'Brien v. People, 42 Colo. 40, 94 P. 284, cases cited in 20 Am. Jur. 1088 (note 10); State v. Fullerton Lumber Co., 35 S. D. 410, 152 N. W. 708; State v. Bachelor, 67 S. D. 259, 291 N. W. 738.

In many of these cases the logic and reason for the rule is not stated. The reason is of course that SDC 34.3636 states a positive rule of law which is part of the law of the case.

In Territory v. Bannigan, supra, the Court said: "It is undoubtedly the duty of the Judge to give full instructions to the jury, covering the entire law of the case, as respects all the facts proved or claimed by the respective counsel to be proved. Still, if he omits something, and is not asked to supply the defect, the party who remained silent cannot complain."

In People v. Clough, supra [73 Cal. 348, 15 P. 7], the Court had under consideration a statute identical with our SDC 34.3636, and the Court said: " * * * although the jurors are the sole determinators of the facts proved by the evidence, yet if there is no evidence, other than the testimony of the accomplice, tending to connect the defendant with the commission of the offense, the judge may direct an acquittal. This, however, simply because the statute prohibits a verdict based upon testimony of an accomplice alone, even although the jury may believe such testimony to be entirely true, and that it establishes the defendant's guilt beyond reasonable doubt; not because the jurors are prohibited from believing the testimony of the accomplice in the absence of the corroboration mentioned in the statute. The legislature might have declared an accomplice incompetent to be a witness; but he may be a witness, and the legislature have not said that he shall not be believed if uncorroborated, but that a conviction shall not be had upon his testimony, unless there is other evidence tending to prove the defendant's complicity in the offense charged. * * * The law-makers have deemed the motives to intellectual assent too complicated and too sacred to be interfered with. But they have limited the practical consequences of the reliance of jurors upon the testimony of an accomplice, by providing that no verdict shall be based on his testimony, in the absence of other evidence tending to prove the guilt of the defendant."

Burns was a self-confessed embezzler of state funds in a prosecution instituted by defendant. Confronted by defendant with the crime, and, because he had lost the money in private speculation, unable to restore it, he wrote to defendant suggesting that suit be instituted against his father, although neither the father nor his firm were concerned with the bond sale in which the embezzlement occurred.

That he was willing to sacrifice his father to save himself is some evidence of his character as a man and his credibility as a witness.

In the light of all this the Court should have given the requested instruction as to the duty of the jury to examine his testimony with the greatest care and caution before accepting it as true. The refusal of defendant's requested instruction as to the law of accomplices and the failure of the trial Court to in any manner instruct on the necessity of corroboration is reversible error.

This leaves for consideration count 3 of the information which charges that the defendant, being then and there the State Treasurer of this state and receiving a salary as such, kept and retained the sum of $51.10 which had been paid to him by the Clarence J. Burns Company and Phill T. Burns by reason of his holding the office of State Treasurer, and which amount was paid to and received by defendant for the performance of a duty of his said office, that is to say, for the registering in the name of the State of South Dakota certain bonds which had been purchased for the state by the defendant as State Treasurer from the Clarence J. Burns Company.

The statute charged in this count to have been violated is SDC 55.2304, which makes it unlawful and a felony for any officer receiving a salary from the state to keep or retain any money, emolument, fee or perquisite paid to or received by him for the performance of any duty or duties of his office.

The evidence relating to this charge is that in June, 1939, the defendant as State Treasurer purchased from the Clarence J. Burns Company, of Aberdeen, a block of $70,000 of soldiers' bonus bonds and paid a commission thereon to that company of $220.50. After the transaction had been completed it developed that because the bonds were registered in the name of the previous owner it would be necessary for the State Treasurer to endorse them in order to prevent the interest being paid to the former owner. The bonds were then in the custody of the Northwestern National Bank of Minneapolis and an officer of the Trust Department of that institution had directed the attention of both the Burns company and the defendant Douglas to the necessity

for such endorsement. In a conversation in the State Treasurer's office at Pierre between defendant and Phill T. Burns this matter was discussed. The defendant expressed the opinion that he would have to go to Minneapolis to make the necessary signatures and that Burns rather than the state should bear the expense of the trip. To this Burns agreed, stating that if defendant would bill the Clarence J. Burns Company for the expense of the trip he (Burns) would take it up with his father and if satisfactory to him they would pay the bill. Following this conversation and on June 25th, 1939, Douglas went to Minneapolis and completed the transfer of the bonds and on June 28th in his office at Pierre wrote a letter to the Clarence J. Burns Company at Aberdeen, enclosing therein a statement prepared by him which showed that he had incurred expense of $51.10 on the Minneapolis trip. The letter and statement came to the attention of Phill T. Burns at his office in Aberdeen, who after placing the letter and statement in the company files, obtained company check payable to himself for $51.00 and then on June 30th, 1939, in a letter to Douglas at Pierre, enclosed his personal check for $51.10 payable to Douglas, who sent it to his bank at De Smet for deposit to his account.

Defendant then filed with the State Auditor his sworn voucher in the amount of $50.99 as his expense for the same trip to Minneapolis and in payment thereof received a state warrant for that amount, which he likewise deposited in his own personal account. Subsequently, but only after criminal proceedings were instituted, he repaid this $50.99 to the state. At the trial he claimed that it was only through mistake and inadvertence that he claimed and collected the same expense from the state.

▮ Defendant contends that as to this count the venue was improperly laid in Brown County and that it was in Hughes County that the crime was actually committed.

Summarizing the evidence, it appears that the only conversation between defendant and Phill Burns took place in Pierre in Hughes County; that the statement of expense and the letter transmitting it to Burns at Aberdeen were prepared by defendant at Pierre, and that the check signed by Phill Burns, while drawn on a bank in Brown County and

sent by mail to Douglas at Pierre, was received by him at Pierre in Hughes County and there endorsed by him and from there mailed by him to De Smet in Kingsbury County for deposit in his bank account.

SDC 34.0804 provides: "When a public offense is committed partly in one county and partly in another county, or the acts or effects thereof constituting or requisite to the offense, occur in two or more counties, the jurisdiction is in either county.

Whether the venue is both in Hughes and Brown Counties depends on whether any of the acts or effects thereof which were requisite to the offense occurred in Brown County.

The statute, SDC 55.2304, does not make it an offense for the officer to collect money, emoluments, fees or perquisites, but only to keep them. Hence the defendant did not violate the statute when he received this $51.10 check, but only when he failed to turn the check or the proceeds thereof over to the state, No crime was committed, no acts constituting or requisite to the offense occurred until defendant received the check. Had he paid the money to the state, no offense would have been committed. The crime was in converting the check to his own use and this was first manifested when instead of turning it over to the state he sent it to De Smet for deposit to his own account.

In the case of State v. Robinson, 71 N. D. 463, 2 N. W.2d 183, 185, 140 A. L. R. 332, the Supreme Court of North Dakota had occasion to construe the North Dakota statute which is exactly the same as SDC 34.0804. In that case the defendant Robinson was motor vehicle registrar of the State of North Dakota and he was charged with violating a statute, reading as follows: "Every public officer, being authorized to sell or lease any property or make any contract in his official capacity, who voluntarily becomes interested individually in such sale, lease or contract, directly or indirectly, is guilty of a misdemeanor."

The evidence showed that Robinson was a stockholder in and secretary of a corporation located in McLean County, North Dakota. With his knowledge and consent, this cor-

poration, in McLean County, furnished gasoline, etc., to automobiles operated in the department of state government which was under Robinson's supervision. That he as a motor vehicle registrar in Burleigh County approved the voucher for payment of the gasoline furnished, and also as secretary of the McLean County corporation he certified to the correctness of the claim made by the motor company. The evidence also showed that, while in Burleigh County, he instructed employees. of his department to purchase the gasoline, etc., from his motor company in McLean County. He was tried in Burleigh County for violation of the statute and he objected to the venue of Burleigh County. The Court said:

"As a general rule it may be said that a crime is committed in a county when the criminal act, its object and purpose, is completed within that county. Ex Parte Lucas, 33 Okl. Cr. 407, 243 P. 990; United States v. Thayer, 209 U. S. 39, 28 S. Ct. 426, 52 L. Ed. 673; State v. Tummons, 225 Mo. App. 429, 37 S. W. 2d 499. * * *

"The act that is made criminal in so far as this case is concerned is the making of a contract contrary to the provisions of the statute. If the contract is illegal it becomes so because of the defendant's interest therein. That interest, as charged by the information and bill of particulars, arises out of the relationship of officer and stockholder that the defendant bears to the Washburn Motor Company. The company's office and place of business are located in McLean County. It is charged that the merchandise in question was furnished to and placed in or upon automobiles belonging to the Department of Motor Vehicle Registration at the company's place of business in McLean County. Part of the merchandise was furnished to the defendant personally and part of it to an employee of the Department who had been authorized and directed at Bismarck in Burleigh County to make such purchases. We must bear in mind that the gist of the crime charged is the making of a contract in which the defendant is interested. The contract was made at the place of business of the Washburn Motor Company. It was completed when the merchandise was delivered to the defendant or to the employee of his department. If the Wash-

burn Motor Company became entitled to payment at all, it became entitled to such payment immediately upon delivery of the merchandise. The State was thereupon obliged to pay for it. * * * In the interest of orderly procedure and safeguarding public funds, persons having claims against the State must submit vouchers and have the claims audited and approved by the State Auditing Board. This procedure, however, does not fix the primary liability of the State to pay for purchases of merchandise made by its authorized officers and employees. The statutory requirements as to the submission and approval of vouchers does not determine the validity of the claim or the ultimate right of the claimant to payment. The liability of the State exists separate and apart from any action of the auditing board. The crime charged was complete when the contract was complete. The completion of the contract was marked by the delivery of the merchandise. It was both contracted for and delivered in McLean County. There rests the venue. The fact that the voucher that resulted in payment was approved by the defendant in Burleigh County, and presented to the state auditing board, and ordered paid in Burleigh County, does not alter that situation. It follows that the crime charged, if committed at all, was committed in McLean County and that the District Court of Burleigh County is without jurisdiction to try the case."

 ██ The crime charged is, in effect, an embezzlement of the funds of the State. It is usually held that the proper venue for embezzlement is the county where the act of appropriation or conversion took place and it has been held that the venue of the indictment charging an embezzlement consisting of a failure to account should be laid in the county where the accused was liable to account. 18 Am. Jur. 611, § 65, and the following cases more or less directly support the rule: Rogers v. State, 14 Okl. Cr. 235, 170 P. 269, L. R. A. 1918E, 742; People v. Gordon, 133 Cal. 328, 65 P. 746, 85 Am. St. Rep. 174; State v. Hengen, 106 Iowa 711, 77 N. W. 453; Hopkins v. State, 52 Fla. 39, 42 So. 52; People v. Davis, 269 Ill. 256, 110 N. E. 9; Kossakowski v. People 177 Ill. 563, 53 N. E. 115; State v. Bailey, 50 Ohio St. 636, 36 N. E. 233. The cases holding that the venue is in the county where the em-

bezzled property is received rather than in the county where the act of appropriation actually occurred are predicated on the fact that in those cases the intent to embezzle was formed in the county of taking. There is no room in this case for the application of this theory. If defendant formed the intention of embezzling this money when he arranged to get it from Burns, his first opportunity to intend an embezzlement was at the conversation with Burns. This was at Pierre in Hughes County. If the intent was formed later it was likewise in Hughes County, for there is no evidence that he was in Brown County at any time between the original talk with Burns at Pierre, prior to his ultimate embezzlement of the money in Hughes County after its receipt. He could then have formed in Brown County no intention to embezzle this money. That the check was written in Brown County on a bank therein situate and was issued in response to a letter and statement of account received in Brown County and that the check was enclosed in a letter which was mailed at Aberdeen to the defendant at Pierre, and after passing through banking channels was subsequently charged to Burns' account in a bank in Brown County, is wholly immaterial as establishing the venue in Brown County. The venue was improperly laid in Brown County.

Since as to count 3 the Court had no jurisdiction and as to counts 1 and 4 there is reversible error in the record, the judgment of conviction is reversed.

POLLEY, ROBERTS, RUDOLPH and SMITH, JJ., concur.

R. C. BAKEWELL, Circuit Judge, sitting in lieu of SICKEL, J., not participating.