STATE OF NEBRASKA, APPELLEE, V. GRETCHEN
HILPERT, ALSO KNOWN AS LETA G. TYLER, APPELLANT.

330 N.W.2d 729

Filed February 25, 1983.   No. 82-224.

Dean S. Forney, Box Butte County Public Defender, for appellant.

Paul L. Douglas, Attorney General, and Patrick T. O'Brien, for appellee.

KRIVOSHA, C.J., BOSLAUGH, MCCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

HASTINGS, J.

The defendant, Gretchen Hilpert, and her husband, John B. Hilpert, were charged in separate informations with the crime of theft by deception, a violation of Neb. Rev. Stat. § 28-512(1) (Reissue 1979). Following a stipulated consolidated trial to the court alone, she was convicted and sentenced to a term of imprisonment of 18 months to 2 years. The errors which she has assigned on appeal, listed in the order in which they will be discussed, are essentially as follows: The court erred in that (1) it considered evidence against her which was not introduced as a part of the State's case in chief, nor by her on defense; (2) the evidence was insufficient to establish beyond a reasonable doubt that the crime charged was committed in Nebraska, in that the intent to deprive, an essential element of the crime, did not occur within the State of Nebraska; (3) the evidence was insufficient generally to establish beyond a reasonable doubt that the defendant committed the crime charged; and (4) the sentence was excessive.

This prosecution arose out of a substantial shortage of funds which developed in a certain guardianship estate wherein John B. Hilpert was the guardian and attorney and the defendant, as John's secretary, apparently actually administered the estate.

At the beginning of the trial, the following colloquy occurred between the court and counsel: "THE COURT: . . . Both of these [cases] have been consolidated for purposes of trial and in both trial by jury has been waived and they are being tried before the Court. . . . MR. MARGHEIM [counsel for John B. Hilpert]: Your honor, we have one procedural matter to ask the Court. THE COURT: Surely. MR. MARGHEIM: We are asking for advice on this. These two cases are consolidated for purposes of trial but presume that that still leaves each defendant with the right to present their individual defenses, possibly conflictive de-

fendants [sic], and each individual defendant to testify or not testify? THE COURT: Yes, that will be all right. MR. MARGHEIM: Okay.'' The record further reflects that Mr. Forney was present representing the defendant Gretchen, and voiced no objection to those statements. The State then presented its case in chief and rested. John B. Hilpert testified in his own behalf and called as a witness the defendant Gretchen, who also testified. No objection to nor request for limitation of applicability of the testimony of either of these witnesses was voiced by the defendant Gretchen. Following John B. Hilpert's rest, counsel for the defendant Gretchen announced that no evidence would be offered in her behalf.

The State's case in chief consisted of testimony by Samuel L. O'Brien, a former county judge of Box Butte County; Lane Nansel, vice president and cashier of the Guardian State Bank, Alliance; L. Leroy Schommer, also a vice president of that bank; Albert T. Reddish, an Alliance attorney; and Lois Pedersen, vice president of the Alliance National Bank; and a great deal of documentary evidence.

Mr. O'Brien identified in person both the defendant and John B. Hilpert. He also testified that John was appointed guardian of the particular estate, that he signed various documents, and that the defendant worked for John as a secretary from the mid-1960s to 1972.

The various annual reports covering the period from September 17, 1971, to September 15, 1979, purportedly made out by the guardian, John B. Hilpert, were examined by the witness Lane Nansel. Each of those reports contained what appeared to be the signature of Lane R. Nansel, as vice president of the bank, certifying the accuracy of the amounts claimed on the report to be on deposit in the bank. However, he testified that with the exception of the one for the year September 17, 1971, to September 16, 1972, none of his signatures were genuine. As

examples of discrepancies in the reports, the witness pointed to his purported certification for the year ending on September 15, 1979, which showed $34,000 in certificates of deposit with his bank, whereas in fact there was but $7,500, and for the year ending on September 16, 1973, an alleged balance of $10,000 in savings certificates, as compared to an actual balance of $5,500. The report for that same year disclosed that the guardian had written a check to the Guardian State Bank in the amount of $5,000 for a certificate of deposit, whereas Mr. Nansel testified that no such certificate was purchased during that time period. Similar instances of false information were detailed by this witness as to many of the other reports.

Mr. Nansel also testified that as of September 24, 1979, there was a total of $8,000 in certificates of deposit in the guardianship account, and that two certificates in the total sum of $5,500 were cashed on April 24, 1980, leaving a June 24, 1980, balance in certificates of deposit of $2,500. He also stated that during the period April 24, 1972, to June 24, 1980, there never was a balance in time certificates for the guardianship of more than $8,000. However, the report for the year ending September 15, 1977, showed a balance of $24,000; for September 15, 1978, a balance of $29,000; and for September 15, 1979, a balance of $34,000.

Exhibit 10 is a photocopy of one Guardian State Bank cashier's check in the amount of $5,489, dated April 24, 1980, payable to the guardianship account in the Alliance National Bank, stamped endorsed for credit to that account, and a draft dated August 7, 1980, in the amount of $2,461.35, drawn on the Colorado National Bank of Denver with the Guardian State Bank as payor, "John B. Hilpert Guardian of Harold E. Uhrich" as payee, with a hand-printed endorsement as follows:

"John B. Hilpert, Guardian
of Harold E. Uhrich
For Deposit Only
Gretchen Hilpert
02-244578
/s/ Gretchen Hilpert."

The $5,489 figure represented the $5,500 of certificates cashed in April, and the $2,461.35 figure represented the balance of the certificates then remaining. These transactions were initiated by way of letters from John B. Hilpert. However, according to a handwriting expert, John B. Hilpert's signature on one of the letters requesting the bank to cash the certificates of deposit was actually written by the defendant. With the payment of $2,461.35, according to Mr. Nansel, any balance which the guardianship had with his bank was "wiped out."

The witness Lois Pedersen of the Alliance National Bank testified that there was a total of approximately 25 checks written on the guardianship account naming defendant as payee, signed by John B. Hilpert, and endorsed by the defendant. The checks were in varying amounts, ranging from $100 to $5,000, totaling something in excess of $14,000, and covered the period from March 10, 1979, to July 31, 1980. The signatures of both parties were verified by a handwriting expert. Ms. Pedersen also testified that the $5,489 cashier's check previously mentioned was deposited in her bank and that shortly thereafter a check in the amount of $5,000, signed by John B. Hilpert, made out to the defendant and endorsed by the defendant to her account, was paid.

L. Leroy Schommer, formerly an employee of the Alliance National Bank, also testified that as to several of the certifications of balance on deposit contained in the guardian's annual reports, the signatures purporting to be his were not in fact genuine.

The witness Albert T. Reddish testified to his acquaintanceship with John B. Hilpert and the defend-

ant, that John practiced law in Alliance, and that the defendant worked as John's secretary. He described conferences with the family of the ward requesting a change in the guardian and correspondence with John B. Hilpert and the defendant, who were then in California, to accomplish this change. In spite of his various requests he never did receive an accounting from John B. Hilpert. According to Mr. Reddish's comparison of the guardian's reports and the bank statements, there was a discrepancy between the two of something over $45,000. Following a hearing in county court, he reported that the county judge suspended Mr. Hilpert's authority as guardian and assessed a surcharge against him of $70,174.41.

Following the State's rest, both the defendant and John B. Hilpert moved to dismiss the information, ruling upon which was reserved by the court. It is not necessary for us to review the propriety of such action by the trial judge for two reasons: The defendant does not assign such action as error, nor does she argue it in her brief; secondly, in *Henggler v. State,* 173 Neb. 171, 112 N.W.2d 762 (1962), we held that following a motion for a directed verdict at the close of the evidence of the State, the introduction of evidence thereafter by the defendant waives any error in the ruling or failure of ruling on the motion, although the defendant is not prevented from questioning the sufficiency of the evidence in the entire record to sustain a conviction.

John B. Hilpert offered testimony in his own behalf. He explained how he turned the accounting of his activities as guardian over to the defendant. Initially, he would have the defendant make out the various checks in payment of the bills of the guardianship, and then he would sign them. He then told how, a few months after he took over this guardianship in 1965, he would sign checks in blank and turn them over to the defendant. He agreed that he did not set up any controls whereby he could

verify her actions. He then described how, in April of 1972, he was told by the defendant that the guardianship was short some $5,000 and intimated that it was his fault because of having turned signed blank checks over to her. It was then that they cashed a number of the guardianship's savings bonds to be placed in the checking account. According to John B. Hilpert's testimony, the defendant expressed regret over what she had done; but in spite of all this, Hilpert continued to rely upon the defendant to do all the bookwork, continued to allow her to manage the money by furnishing her with signed blank checks, continued to sign the annual reports prepared by the defendant without examining them, and at no time made any examination to determine how much money was left in the guardianship account or to verify what the defendant had told him as to what was missing. He made no check of bank statements, deposit slips, or anything of that nature. According to his testimony, it was not until sometime in the summer of 1980, during a casual conversation when they were living in Sacramento, that he discovered that the actual shortage was then about $50,000. He admitted that sometime in July of 1980 he made the decision not to file an accounting with the court.

The defendant was then called as a witness by John B. Hilpert, and when asked about the shortage in the guardianship account, she explained that "I comingled [sic] the money." She admitted that she changed the figures on the 1971-72 guardian's report after the bank officials had signed the certification. The defendant admitted that she used some of the money which caused the shortages for her own use. She said that all of the checks which were made out to her had been signed by John B. Hilpert in blank, that she would deposit them to her account as needed, and that she knew that what she was doing was illegal. She said that she never told John B. Hilpert about putting guardianship money in her ac-

count. She also said that she was sure that at one time, at least, she had promised John B. Hilpert that she would not misappropriate any more money.

Following the defendant's testimony, John B. Hilpert's counsel announced that he would rest his case. The following colloquy then occurred between the court and counsel: "THE COURT: The defendant Gretchen Hilpert really, technically, didn't offer testimony, isn't that right, she was testifying for defendant John Hilpert? MR. FORNEY: That's right, Your Honor. THE COURT: Do you have any evidence, Mr. Forney? MR. FORNEY: No, Your Honor, we have no evidence on behalf of Leta Hilpert in her case. THE COURT: Then does the state offer rebuttal of John Hilpert? MR. PAYNE: We have none." Both John B. Hilpert and the defendant, through counsel, renewed the "motion made at the close of the state's evidence," in answer to which the court indicated that he would have the same ruling.

In her first assignment of error, the defendant insists that because of the closing comments set forth above, as well as the opening stipulation, neither her own testimony nor that of John B. Hilpert is available as evidence in her case. We disagree. There is obviously no constitutional barrier to the utilization of this testimony as violating the right to cross-examination or against self-incrimination. "The general rule is that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. . . . 'A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives . . . .' " *State v. Robinson,* 202 Neb. 210, 215, 274 N.W.2d 553, 556 (1979).

Nor was it necessary for the State to specifically cause such evidence to be introduced in the defendant's case. By the very nature of a common or consolidated trial, all evidence received is equally binding on all defendants unless otherwise re-

stricted. Evidence offered by one defendant in a joint trial, if competent, is evidence against other persons charged in the same indictment. *State v. Linden,* 171 Wash. 92, 17 P.2d 635 (1932). " 'Where one of several defendants on trial together voluntarily becomes a witness, he is a witness for all purposes. If he knows facts injurious to a co-defendant, they may be brought out either by his own counsel or by the State. . . .' " *Stanley v. State,* 189 Tenn. 110, 122, 222 S.W.2d 384, 389 (1949). " 'Evidence given by a defendant on his own behalf, upon his trial for a criminal charge is competent, and proper for the consideration of the jury, both for and against a co-defendant jointly upon trial.' [Citation omitted.]" *Kennon v. State,* 181 Tenn. 415, 423, 181 S.W.2d 364, 367 (1944).

If the testimony offered by John B. Hilpert in some way was not relevant or competent as to defendant, or if she did not wish to waive her fifth amendment right against incrimination, she should have raised the proper objections at the time. However, "[t]he fact that one defendant wishes to use the other as a witness does not of itself entitle him to a separate trial." *State v. Pelton,* 197 Neb. 412, 419, 249 N.W.2d 484, 488-89 (1977).

The defendant's next assignment of error relates to her claim that the State of Nebraska had no jurisdiction over her for this alleged crime because it was not committed in Nebraska. The crime charged was "theft by deception." There are two elements which must necessarily be present before such crime is committed: (1) The obtaining of the property of another by deception, and (2) With the intent to deprive the owner thereof. Neb. Rev. Stat. §§ 28-511, 28-512 (Reissue 1979). The defendant refers to the trial court's memorandum opinion in which it is suggested that the element of intent was formed in the mind of the defendant while in California. Therefore, she suggests, since all of the ele-

ments of the crime did not occur in Nebraska, Nebraska does not have jurisdiction.

She relies particularly on the case of *State v. Karsten,* 194 Neb. 227, 231 N.W.2d 335 (1975), for the proposition that penal statutes are essentially local in nature and that Nebraska may not prosecute individuals for alleged crimes committed outside the state. However, that case involved a prosecution for a conspiracy to commit an assault in Colorado. No battery was ever committed. We simply held in that case that Nebraska had no jurisdiction because no Nebraska law was violated. "However, the Nebraska assault statute has no force in Colorado where the assault which was the subject of the conspiracy in this case was to have taken place. It was error for the District Court to submit the case to the jury upon the theory that Nebraska law was applicable to an act which was to be performed in Colorado." *Id.* at 229, 231 N.W.2d at 337. Simply stated, the decision holds that, on the facts presented, it was not a violation of Nebraska law for the defendant to conspire to break the law of another state.

*Forney v. State,* 123 Neb. 179, 242 N.W. 441 (1932), and *State v. Hyslop,* 131 Neb. 681, 269 N.W. 512 (1936), also relied upon by the defendant, are also distinguishable. In the present case we are not confronted with the situation where the act constituting the crime occurred outside the state. The property was taken within this state upon presentation of the checks for payment to a bank located in this state under the terms of a guardianship established by the courts of this state.

We are therefore faced with the question of whether or not all of the elements of an offense must occur within the state, as contended for by the defendant. We are unable to find any Nebraska authority on this point. Turning to other jurisdictions, we observe two well-defined rules of law applicable to jurisdictional questions arising in embezzlement cases. The clearest statement of these rules has

been made by the Arizona Supreme Court. One such rule is demonstrated in *State v. Scofield,* 7 Ariz. App. 307, 438 P.2d 776 (1968). In that case the defendant leased a car in Arizona, crossed the state line, and after leaving the State of Arizona, decided to convert the automobile to his own use. In holding that the crime occurred in Arizona, the court said: "Generally, the State of Arizona has no jurisdiction over offenses committed outside of its territorial limits. 21 Am.Jur.2d Criminal Law § 383, at 403-04; 22 C.J.S. Criminal Law § 133, at p. 353; and see State v. Jacobs, 93 Ariz. 336, 380 P.2d 998 (1963). However, it is also generally accepted that if the requisite elements of the crime are committed in different jurisdiction [sic], any state in which an essential part of the crime is committed, may take jurisdiction, 21 Am.Jur.2d Criminal Law § 385, at 404, and this is particularly true as to the state in which the crime is consummated. 22 C.J.S. Criminal Law § 133b, at p. 355. See Commonwealth v. Thomas, 410 Pa. 160, 189 A.2d 255, 5 A.L.R.3d 879 (1963), and cases cited therein." *Id.* at 315, 438 P.2d at 784. This position is also taken by Nevada. See *Sheriff v. Thompson,* 85 Nev. 211, 452 P.2d 911 (1969).

The other rule, perhaps more nearly in point as far as the facts of the present case are concerned, is found in *State v. Roderick,* 9 Ariz. App. 19, 448 P.2d 891 (1968). The rule there applies to a defendant who embezzles funds from an account entrusted to him or her, with the intent to do so being formed in a state different from that in which the funds are located. The Arizona court said: "The defendant contends that the State of Arizona had no jurisdiction since the offense was committed outside of its territorial limits. We have recently held, however, that if the requisite elements of a crime are committed in different jurisdictions, any state in which an essential part of the crime is committed may take jurisdiction. State v. Scofield, 7 Ariz.App. 307, 438 P.2d 776 (1968); see also, A.R.S. § 13-112. If, as we

shall subsequently discuss, the defendant committed theft by embezzlement, then the state in which he had a duty to account, namely Arizona, had jurisdiction. State v. Hoffman, 171 Kan. 116, 229 P.2d 768 (1951); Williams v. State of Oklahoma, 365 P.2d 569 (Okl.Cr.App., 1961); State v. Douglas, 70 S.D. 203, 16 N.W.2d 489 (1944); 22 C.J.S. Criminal Law § 185(11)." *Id.* at 21, 448 P.2d at 893.

In line with the foregoing authorities, we hold that where the requisite elements of a crime are committed in different jurisdictions, if an essential element of the crime is committed in this state, jurisdiction to prosecute is present. In this case, by taking funds from a guardianship account created by the courts of this state and to which courts the defendant and John B. Hilpert had a duty to account, and which funds were taken out of a bank account in this state by means of written orders drawn and constructively presented for payment by the defendant, we conclude that one or more of the essential elements of the crime have been committed within this state so as to confer jurisdiction.

From a review of the essential facts detailed above, it should be apparent that there was substantial evidence to support a conviction of the defendant. This court will not interfere on appeal with a finding of guilt based upon evidence unless it is so lacking in probative force that we can say as a matter of law that it is insufficient to support such finding beyond a reasonable doubt. *State v. Olson*, 200 Neb. 341, 263 N.W.2d 485 (1978).

Finally, we consider the defendant's claim that the sentence imposed upon her was excessive. The defendant was charged and found guilty of theft of property in the "value of more than $1,000." This is a Class III felony as provided for in Neb. Rev. Stat. § 28-518 (Reissue 1979), which provides for a possible maximum term of imprisonment of 20 years. We have said on numerous occasions that a sentence imposed within the limits of the statute will not be

disturbed on appeal absent an abuse of discretion. *State v. Kelly,* 207 Neb. 295, 298 N.W.2d 370 (1980).

This case involved a series of thefts over a prolonged period of time by one in a position of trust and who showed little if any true remorse. The trial judge conducted a detailed sentencing hearing in which counsel for the defendant, as well as for John B. Hilpert, was permitted to address the court in detail. The judge reviewed the criteria for sentencing and probation, and rejected the latter. The record appears to support a thorough and mature consideration of all the circumstances of the case. There was no abuse of discretion.

The judgment and sentence of the District Court are affirmed.

AFFIRMED.

CLINTON, J., not participating.