NELLIE ELLIOTT, APPELLEE, v. CITY OF OMAHA, APPELLANT.

FILED DECEMBER 30, 1922. No. 22174.

1. **Municipal Corporations: PENSIONS: LINE OF DUTY.** The contracting of a disease (in this case pneumonia) in the line of duty, resulting in death, is within the meaning of section 2517, Rev. St. 1913, which provides for a pension to the widow or minor children of a deceased fireman in a paid fire department of a city of the metropolitan or first class, whose "death is caused by or is the result of *injuries* received while in the line of duty."

2. ———: ———: ———. Evidence examined, and *held* sufficient to submit to the jury the question whether the contracting of pneumonia by the deceased occurred while in the line of duty as a fireman, and whether his death was the result of such a disease.

APPEAL from the district court for Douglas county: CHARLES LESLIE, JUDGE. *Affirmed.*

*Dana B. Van Dusen* and *John F. Moriarty,* for appellant.

*Kennedy, Holland, De Lacy & McLaughlin, contra.*

Heard before MORRISSEY, C. J., ALDRICH, DAY and FLANSBURG, JJ., REDICK, District Judge.

DAY, J.

Action by Nellie Elliott against the city of Omaha to recover $150 claimed to be due her as a pension, as the widow of Harold B. Elliott, deceased, who at the time of his death was a member of the paid fire department of defendant city, and who, it is alleged, died as the result of injuries received while in the line of his duty as such fireman. The trial resulted in a verdict and judgment for the plaintiff. Defendant appeals.

The plaintiff's action is based upon section 2517, Rev. St. 1913, which provides: "In case of the death of any fireman in a paid fire department in any city of the metropolitan, or first class, while in the line of duty, or death is caused by or is the result of injuries received while in the line of duty, then the same rate of pension as herein provided for in the next preceding section shall be paid to the widow or minor children of such deceased fireman, as provided in such section." The preceding section mentioned in section 2517, in so far as it relates to the present inquiry, provides, in substance, for a pension to retiring firemen of at least 50 per cent. of the amount of salary such retiring fireman was receiving at the time he retired, but in no case shall the amount of the pension be less than $50 a month; that, upon the death of any such retired fireman, the same rate of pension as herein provided shall be paid to the widow of such deceased fireman, during such time as she shall remain the widow of such deceased fireman.

The record shows that Harold B. Elliott was a member of the paid fire department of defendant city from November 18, 1908, until November 12, 1918, the time of his

death; that his salary was $100 a month; that the plaintiff is his widow, and is still unmarried; and that the deceased died of pneumonia. The real issue presented is whether the words, "injuries received while in the line of duty," in the section of the statute above quoted, are broad enough to include disease contracted while in the line of duty, and the further question whether the facts in this case are sufficient to show that the disease was contracted in the line of duty.

It will be noted that the statute provides for a recovery when "death is caused by or is the result of injuries received while in the line of duty." The word "injury," in ordinary usage, is one of very broad significance, and includes any hurtful or damaging effect which may be suffered by any one. Standing alone, it has no more application to a hurt or damage arising from violence than to any other injurious influence. That a disease is a hurt or damage to the physical system seems too plain to require argument. The work of a fireman is of great importance to the community, and the public welfare demands that he be encouraged in the performance of his dangerous occupation. It is difficult to see why the dependents of a fireman, named in the statute, should not be recompensed for his death resulting from disease contracted in the line of duty, the same as dependents of a fireman who is injured in the line of duty by a falling wall and dies from such injury. These and other considerations lead us to believe that the word "injuries," as used in this statute, was intended to be broad enough to include the contracting of disease.

Cases arising under compensation acts are not very helpful to the present discussion, because in most, if not all, of them compensation is allowed only for injuries by accident, arising out of and in the course of the employment. It will be readily conceded that the phrase, "injuries received while in the line of duty," has a

much broader meaning than the language generally used in compensation acts.

In *State v. Trustees*, 138 Wis. 133, the court had before it for construction a statute essentially like our own. There, as here, the statute provided for a pension for the family of a policeman who should die as the result of injuries received while in the line of duty. It was held that the contracting of a disease in the line of duty (in that case, as in this, pneumonia) was an injury within the meaning of the act. These considerations and others lead us to conclude that the phrase, "injuries received while in the line of duty," does not alone mean that a fireman must suffer an accident or some violent physical injury, but includes any hurtful effect which a fireman may receive in the line of his duty, and includes diseases contracted in the line of his duty.

The defendant earnestly insists that there is an utter failure on the part of the plaintiff to show that the pneumonia which was the cause of deceased's death was contracted by him while in the line of his duty, or that there was any causal connection between his death and the employment. The record shows that deceased was a member of the paid fire department of defendant city; that he was on duty during the night of November 1, Friday night, and drove to a fire. That on Saturday, the 2d, he was detailed to assist in making an inspection of buildings in the business district, which required him to go upon every floor of the buildings, to inspect the wires, floors, windows leading to fire escapes, and in general to make a thorough examination of the buildings. This involved considerable walking, and the going from one building to another. As to whether he climbed the stairway in doing this work or used elevators is not shown. He reported for duty soon after 8:30 o'clock in the morning for this assignment dressed in regulation uniform. He wore a heavy blue coat, and a heavy double-breasted wool shirt, and a cap. The work of inspection commenced soon after 8:30 a. m. and was concluded a

little after 12 o'clock. When he left home in the morning he was feeling all right. What he did between 12 and 2:30 o'clock is not shown. When he arrived home shortly after 2 p. m., he was perspiring; his underclothing was wet with perspiration; he was feeling bad; had chills and fever and aches; and complained that he had been chilling all the afternoon. He ate no lunch; changed his wet underclothing for dry; and reported back for duty at 5:30 in the afternoon. On Sunday he came home; felt awfully bad; moped around all day; complained of aches and pains and chills and fever. On Sunday night he reported for duty at the fire station; was taken quite sick, and was put to bed. On Monday he came home in the morning hardly able to walk; was immediately put to bed; a physician came in about a half hour; and at that time deceased had double pneumonia, a temperature of 106, was delirious, and never got out of bed again. He died on the 12th of November. Without objection, the following evidence was received: "Q. As soon as he got back from the inspection, did he make any complaint then? A. Yes; he did. Q. What complaint did he make? A. Well, that he had been overheated and had chills and fever. You know when you feel bad how you complain; I cannot remember just the words he used. Q. Did he say he had chills and fever before he came home? A. He said he had been chilling all the afternoon. * * * Q. And then Monday morning he came home; in other words, after he got these chills and fever, while making this inspection he kept getting worse and worse? A. Yes; that is the way it was."

From this testimony especially when supplemented by the expert medical testimony, we are of the opinion that the jury could very properly say that the chills and fever, and the subsequent pneumonia, was contracted by the deceased while in the line of duty, and that his death was the result thereof.

The instructions of the court were as favorable to the defendant's interest as it could well ask, and there was no error in giving them.

From what has been said, it follows that the judgment of the district court is right, and it is

AFFIRMED.