## In re BENSON.

No. 25491. Nov. 10, 1936.

Rehearing Denied Dec. 8, 1936.

Harlan Deupree, Municipal Counselor, and P. E. Gumm, Asst. Municipal Counselor, for plaintiff in error.

Lillard & Gibbons, for defendant in error.

OSBORN, V. C. J. This matter originated before the board of trustees of the firemen's relief pension fund of Oklahoma City upon application of Juanita Benson, hereinafter referred to as applicant, for a pension because of the death of her husband, Captain W. A. Benson, who had been a member of the fire department of Oklahoma City. The application was denied by the board and an appeal was taken to the district court of Oklahoma county, where the order of the board was reversed and the pension was ordered paid. The board of trustees of the firemen's relief and pension fund and the city of Oklahoma City, hereinafter referred to as respondents, appealed from the order and judgment of the district court.

At the outset we are met with a challenge to the jurisdiction of the district court on the ground that no appeal is provided by law from the decision of the pension board, consequently the decision of said board is final.

In this connection it will be necessary to refer briefly to the various legislative acts relating to pensions for firemen and their dependents. We shall refer to only such portions of the acts as are germane to the issue involved herein.

The first legislative act dealing with pensions for firemen and their dependents is chapter 244, Session Laws 1913. Section 4 of the act provides for retirement pensions for firemen. Section 5 of the act deals with pensions for firemen who become physically or mentally disabled in the performance of

duty. Section 8 of the act provides for pensions for the widows of firemen and for their children under age of 16 years whenever "any member of the fire department * * * shall lose his life in the performance of his duty." Section 4 of the 1913 act was amended by section 1, chapter 161, Session Laws 1917, the amendment having no bearing upon any issue involved herein. In 1919, there was enacted chapter 1, Session Laws 1919. Section 1 of the act (sec. 6102, O. S. 1931), in part, provides:

"Any person possessing the qualifications required and provided for under chapter 161, of the Session Laws of 1917, who deems himself aggrieved by the decision of the pension board on his claim for pension, either in rejecting his claim or in the amount allowed by said board, may appeal from such decision to the district court of the county in which such city liable for such claim may be located, by giving written notice of his intention to appeal to the clerk of such city, and by filing with the court clerk a transcript of the proceedings had before such pension board within 30 days from the date of such decision. * * *"

In 1921 there was enacted chapter 35, Session Laws 1921. Section 1 of that act (sec. 6101, O. S. 1931) purported to amend section 4 of chapter 244, Session Laws 1913, but no reference was made to section 1, chapter 161, Session Laws 1917. Said act deals with retirement pensions, and further provides that in the event of the death of the pensioner his widow shall be entitled to the pension until she shall marry, or that his children shall be paid such pension until they shall become 16 years of age. Section 2 of chapter 35, Session Laws 1921 (sec. 6103, O. S. 1931), deals with pensions for physically or mentally disabled firemen, and provides further:

"* * * That should death result from any injury or sickness, sustained by any such person while in, and in consequence of, the performance of his duty as an employee of such regularly constituted fire department a monthly pension equal to one-half (½) the amount of the salary attached to the rank which he may have held in such fire department shall be paid to his widow, children, or other person wholly dependent upon such person for support."

It is the last-cited provision under which applicant herein seeks her pension, and it is section 1 of chapter 1, Session Laws of 1919, that it is claimed provides for an appeal.

"It is a cardinal rule that in the construction of statutes, the legislative intent must govern, and to arrive at the legislative intent the entire act must be considered, together with all other enactments upon the same subject, and when the intention of the Legislature can be gathered from the entire statute, words may be modified, altered, or supplied to give the statute the force and effect which the Legislature intended." Oklahoma Natural Gas Co. v. Corporation Commission, 90 Okla. 84, 216 P. 917.

"When it is apparent that a strict interpretation of a particular statute, construed alone, would defeat the intention of the Legislature as shown by other legislative enactments which relate to the same subject, and which have been enacted in pursuance of and according to a general purpose in accomplishing particular results, the suppression of a particular evil, such construction should not be adopted." De Hasque v. Atchison, T. & S. F. Ry. Co., 68 Okla. 183, 173 P. 73.

"In order to ascertain the intention of the Legislature in the enactment of section 4031, the court may look to each part of the statute, to other statutes upon the same or relative subjects, to the old law upon the subject, to the evils and mischiefs to be remedied, and to the natural or absurd consequences of any particular interpretation." Blevins v. W. A. Graham Co., 72 Okla. 308, 182 P. 247.

"Where the literal meaning of a statute would result in great inconvenience, or lead to absurd consequences which the Legislature could not have contemplated, the courts are bound to presume that such consequences were not intended, and to adopt a construction which will promote the ends of justice and avoid the absurdity." Campbell v. Cornish, 163 Okla. 213, 22 P. (2d) 63.

"Statutes giving right to appeal are to be liberally construed." State ex rel. Russell v. Mueller (Mo.) 60 S. W. (2d) 48; Harding v. City of Raymondsville (Tex. Com. App.) 58 S. W. (2d) 55; State ex rel. v. District Court of Lewis & Clark County (Mont.) 19 P. (2d) 226.

An examination of the various legislative acts discloses no intent to discriminate between the various classes of beneficiaries named. To adopt the strict and literal construction of section 1, chapter 1, Session Laws 1919 (sec. 6102, O. S. 1931), contended for by respondents would be to hold that the decision of the pension board is final in all cases except where a fireman seeks a retirement pension for his own benefit. To so hold would be to do violence to the wholesome and beneficent purpose of the law relating to such pensions. No reason for such discrimination is suggested by any of the parties to this appeal. To adopt a literal construction of the statute (sec. 6102, supra) in this case would be to reach an absurd conclusion and would avoid rather than promote the ends of justice. We therefore hold that any person who is specifically named as a

beneficiary under the acts providing for pensions for firemen and their dependents is qualified and entitled to appeal from the pension board to the district court.

Respondents' second proposition is stated as follows:

"Captain Benson's death was not the result of an injury or sickness sustained by him while in or in consequence of the performance of his duty as an employee of the fire department."

Under the uncontradicted testimony, Captain Benson and Lieutenant Elmer Rogers were assigned to inspect St. Anthony's Hospital on the morning of March 27, 1933; said inspection was made by said officers while wearing the regulation winter uniforms of the fire department. Captain Benson became warm while making the inspection. Upon leaving the hospital about 12:15 p. m., Captain Benson removed his coat and his shirt was damp with perspiration, and Lieutenant Rogers protested; they drove on the north side of the hospital looking over the same and discussed the matter of their inspection and report until about 1 o'clock p. m., during which time Captain Benson sat in the car, a Ford coach, with the windows down, without his coat, and they then proceeded to check over the district and drove on the north and west part of town until 2 or 2:30 p. m.; their official hours on duty ceased at noon and they went on duty again at 6 o'clock that evening. Lieutenant Rogers and Captain Benson, after they returned to work in the evening, conferred about the report and finished making same out, and after they had done this went across the street to get a cup of coffee and came back across the street to the fire department, and as they stepped off the curb Captain Benson told Lieutenant Rogers he felt feverish and felt like he had caught cold. Captain Swirczynski testified that after he returned to work at 6 p. m., he was looking over some inspection sheets with Captain Benson and he noticed Captain Benson had an awful cough and spoke to him about it. Captain Benson became worse during the night, and Dr. L. C. Boatwright was called in and found Captain Benson chilling all over. On March 29th his illness developed into bronchial pneumonia and Dr. Boatwright attended him to the time of his death, April 7th. Dr. Boatwright described Captain Benson as a man in exceptionally good condition and testified that he had no way of determining the direct cause of Captain Benson's illness; that it is very difficult to determine the exact cause of such illness, but that same could

have been caused by exposure, sudden changes of temperature, and lack of resistance, and that in his opinion the bronchial pneumonia from which Captain Benson died was due to the exposure.

The board of pensions in the order denying the application for pension made the following finding:

"That Captain Benson was a member of the fire department of the city of Oklahoma City, for a period of approximately fourteen (14) years prior to his death; that he died on or about the 7th day of April, 1933, as a result of bronchial pneumonia; that he became ill on or about the 27th day of March, 1933; that just prior to his illness, and on the morning of March 27, 1933, Captain Benson, together with Lieutenant Rogers, were assigned to making an inspection of St. Anthony's Hospital; that said inspection was made by said officers while wearing the regulation winter uniform of the fire department with the exception that Captain Benson wore a heavier wool shirt than that required by the regulations, the wearing of which shirt was permissible by the rules and regulations of said department; that he became warm while making the inspection and that said inspection ceased at about 12:15 p. m. of said 27th day of March, 1933; that according to the evidence, his duties so far as the department was concerned, ceased at 12:15 p. m. of said date; that immediately thereafter Captain Benson removed his coat, and although cautioned by his associate, Lieutenant Rogers, that he should not expose himself, as his shirt was wet with perspiration, Captain Benson continued to do so by leaving off his coat and sat in an automobile for nearly an hour discussing matters with Lieutenant Rogers, still with his coat off and subjecting himself to the possibility of catching cold.

"The board further finds that said Captain Benson was off duty between 12:15 p. m. and 6 p. m. of said day, and that from the evidence in this case there was no other cause for his illness and no hazard encountered in any way and that the illness was brought about by his exposure in the manner hereinbefore related and that such exposure was not during a time when he was in line of duty in fire service or other duties imposed by the rules and regulations of the fire department."

And their conclusion was as follows:

"It is therefore the unanimous conclusion of the members of the board that the said Captain W. A. Benson did not lose his life while in the performance of his duty nor from any injury or sickness contracted or arising from any injury or other cause received and suffered in the line of duty while in fire service or while in other service con-

nected with the fire department, and that the application of the widow should be, and the same hereby is denied."

The district court made the following finding:

"The court finds that the proximate cause of pneumonia was his becoming too warm in the hospital and the subsequent removal of his coat. The two combined were the proximate cause. The court further finds that during the half hour the testimony shows his coat was removed, he was actually in the service of the fire department in discussing and arranging the making of the report with his assistant, Lieutenant Rogers. * * * The court therefore finds that Captain Benson was in the actual service of the fire department until at least 12:45 p. m. on the day said inspection was made."

Plaintiffs in error contend that the exposure which caused Captain Benson's sickness occurred after his duties ceased and resulted from Captain Benson's failure to protect himself after he had become warm, and especially after he had been cautioned not to remove his coat; that therefore, the sickness was not contracted as a consequence of anything he did while he was in active service, but was the consequence of something he did while off duty and not in active service. Apparently this was the view taken by the board of pensions. With this view we do not agree. It may be true, had Captain Benson not removed his coat, he might not have caught cold, but negligence does not constitute grounds for denying the pension.

The purpose of laws providing for firemen's pensions is beneficial and it has frequently been held that such laws should be liberally construed in favor of those to be benefited. Colton v. Board of Trustees, 287 Ill. 56, 122 N. E. 73; Casserly v. City of Oakland (Cal.) 12 P. (2d) 425; Elliott v. City of Omaha, 109 Neb. 479, 191 N. W. 653. The language of our statute is broad and does not require a very liberal construction to reach the conclusion that Captain Benson incurred the sickness from which he died "while in," and "in consequence of, the performance of his duty," and in our opinion the evidence in this case amply sustains the finding of the district court as to the "cause" of Captain Benson's death. "Cause" and "consequence" are correlative terms. One implies the other. When an event is followed in natural sequence by a result which it is adapted to produce, or aid in producing, that result is a consequence of the event, and the event is the result of the cause. 11 C. J. 36, note 74 (a); Monroe v. Hartford St. R. Co., 76 Conn.

201, 207, 56 A. 498; Kelsey v. Rebuzzini, 87 Conn. 556, 89 Atl. 170, 52 L. R. A. (N. S.) 103, at p. 106. See, also, 1 C. J. p. 470.

In Elliott v. City of Omaha, supra, the facts approximate more nearly the facts in the case at bar than any other case we have been cited to or found. The Nebraska statute provided for a pension when "death is caused by, or is the result of injuries received while in the line of duty." The court held that the word "injuries," as used in this statute, was intended to be broad enough to include contracting disease, and that the dependents of a fireman who died from pneumonia contracted in line of duty were entitled to recover. In passing upon a similar contention to that made here, the court said:

"The defendant earnestly insists that there is an utter failure on the part of the plaintiff to show that the pneumonia which was the cause of deceased's death was contracted by him while in the line of his duty, or that there was any causal connection between his death and the employment. The record shows that deceased was a member of the paid fire department of defendant city; that he was on duty during the night of November 1, Friday night, and drove to a fire. That on Saturday, the 2d, he was detailed to assist in making an inspection of buildings in the business district, which required him to go upon every floor of the building, to inspect the wires, floors, windows leading to fire escapes, and in general to make a thorough examination of the buildings. * * * He reported for duty soon after 8:30 o'clock in the morning for this assignment dressed in regulation uniform. He wore a heavy blue coat, and a heavy double-breasted wool shirt, and a cap. The work of inspection commenced soon after 8:30 a. m., and was concluded a little after 12 o'clock. When he left home in the morning he was feeling all right. What he did between 12 and 2:30 o'clock is not shown. When he arrived home shortly after 2 p. m., he was perspiring; his underclothing was wet with perspiration, he was feeling bad; had chills and fever and aches; and complained that he had been chilling all the afternoon. He ate no lunch; changed his wet underclothing for dry; and reported back for duty at 5:30 in the afternoon. On Sunday he came home; felt awfully bad; moped around all day; complained of aches and pains and chills and fever. On Sunday night he reported for duty at the fire station; was taken quite sick, and was put to bed. On Monday he came home in the morning hardly able to walk; was immediately put to bed; a physician came in about a half hour; and at that time deceased had double pneumonia, a temperature of 106, was delirious and never got out of bed again. He died on the 12th of November. * * *

"From this testimony, especially when supplemented by the expert medical testimony, we are of the opinion that the jury could very properly say that the chills and fever, and the subsequent pneumonia, was contracted by the deceased while in the line of duty, and that his death was the result thereof."

Due to the dissimilarity in the wording of the various statutes and differences in the facts involved, it would serve no useful purpose to burden this opinion with citation of other cases. In our opinion the judgment of the district court carries out the spirit and intent of our statute.

The judgment is affirmed.

McNEILL, C. J., and BAYLESS, BUSBY, WELCH, PHELPS, CORN, and GIBSON, JJ., concur. RILEY, J., absent.