RAY EVANS, APPELLEE, V. CITY OF LINCOLN, APPELLANT.

22 N. W. 2d 565

FILED APRIL 19, 1946. No. 31959.

*Max Kier* and *A. A. Whitworth,* for appellant.

*Baylor, Bloss ﹠ Evnen* and *Davis, Stubbs & Healey,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

CARTER, J.

This is an action by the plaintiff, Ray Evans, to recover benefits from the city of Lincoln under the Fireman's Pension Act in effect prior to 1943 (§§ 2439 to 2442, inclusive, Comp. St. 1922). The jury returned a verdict for $3,085.02 and judgment was entered thereon. The city appeals.

The record shows that plaintiff was employed as a fireman for the city of Lincoln from May 1, 1922, until July

9, 1941. On the latter date, while serving as such fireman, he was called to attend a fire in the Burlington railroad shops in Havelock, a suburb of the city of Lincoln. Plaintiff rode to the fire on a combination pump and ladder truck and proceeded to assist in connecting up the water lines and getting water to the fire. For an hour or more he worked in the smoke and heat of the burning building in an attempt to reach the fire. The building was a wood-drying kiln which was heavily insulated to hold heat in the drying out of green lumber. The evidence is that the temperature in the kiln during the processing period was from 180 to 200 degrees. The only openings in the building were large doors at each end. The smoke was extremely dense, which required the firemen to work close to the floor for very short periods of time. After working in the building for an hour or so, plaintiff was directed to work on the roof of an adjoining building. He and others climbed a ladder to the adjoining roof, pulling the charged water line up after them. The evidence is that, as they proceeded along the roof dragging the hose after them, a hose connection caught on the eave of the roof. When it came loose, plaintiff fell on his chest and knees, bruising his knees on the firemen's axes, ceiling hooks, and crowbars that were scattered about on the roof. The evidence is that he was helpless at that time; that he had the wind knocked out of him and that he was weak, worn, and exhausted. After resting ten or fifteen minutes he tried to assist with the work, but he was so weak and nauseated that he could do very little. He did assist in rolling up two or three sections of hose when the fire was extinguished. He rode back to the fire station on the rear platform of the truck, holding on to the hand bars for support. On arrival at the fire station he was so dizzy and nauseated that he was assisted from the truck and placed in bed. Plaintiff's personal physician was called and he was immediately taken to a hospital where he remained for five or six days. The evidence shows that after his return home he suffered from dizziness, short breath, and chest pains whenever he

attempted to work or became excited. He never returned to his position as a fireman. In 1942, he moved to Seymour, Iowa. In the spring of 1943, he moved to a 120-acre farm near that point, which he owned. The record discloses that he was able to do some supervisory work in connection with the operation of the farm, that he on occasion could drive a tractor for short periods of time, that he sometimes was able with difficulty to milk a cow, that he could ride a horse and drive an automobile. The evidence is clear that he could do no work requiring physical exertion and that he employed help to do practically all the farm work. There is evidence that he could not do the work of a fireman or of a farm hand.

There is evidence in the record establishing that plaintiff had a slight limp prior to July 9, 1941, and that he had a limitation of motion in his right knee. Plaintiff's evidence is that he injured his right knee when struck by a hose nozzle during a drill in 1932. He had passed medical examinations on several occasions before July 9, 1941, testing his fitness as a fireman. He says that his leg never interfered with his work prior to July 9, 1941. This fact is corroborated by several other firemen who worked with him during that time. After July 9, 1941, the knee condition became progressively worse. At the time of the trial he could get around only with the assistance of a crutch or cane.

The plaintiff's personal physician and a physician who qualified as a heart expert state that plaintiff is suffering from a coronary occlusion which occurred on July 9, 1941, and that he is now totally and permanently disabled. They testify to the symptoms evidenced at the fire on July 9, 1941, and the subsequent condition of the plaintiff as providing adequate proof of their statements. They also testify to the arthritic condition of the right knee and conclude that it was a traumatic arthritis and that the aggravation resulting from his fall on July 9, 1941, was the cause of the present condition of his right knee. The medical experts called by the city testify that plaintiff is suffering

from degenerative arthritis; that he has such an arthritic condition in both knees and in the lower back. They state that his disability is the result of this degenerative arthritis and not the result of any accident at the fire. They testify further that they find no evidence of a coronary occlusion of any kind. The shortness of breath, weakness, and chest pains are explained as resulting from nerve interference adduced by the arthritic condition of the spine. The experts were capably examined and cross-examined. Their opinions, based on the facts produced and their learning and experience, were presented to the jury. It was clearly a question for the jury to decide.

The contention is advanced that plaintiff is not totally and permanently disabled within the meaning of the Firemen's Pension Act. In this respect, total and permanent disability does not mean a state of utter helplessness. Generally speaking, a fireman is totally and permanently disabled under this statute when the disability from which he suffers renders him permanently unable to obtain, hold, or do any substantial amount of remunerative work, either in his previous occupation, or in any established and recognized field of employment for which he is fitted. Total disability contemplates the loss of earning power. In measuring the loss of earning power the following elements are to be considered: Ability to earn wages, eligibility to procure employment generally, ability to hold a job obtained, and capacity to perform the tasks of the work in which a person is engaged. The trial court instructed substantially in this language. The evidence shows that plaintiff was fitted to perform the work of a fireman and of a farmer. We think the evidence is sufficient to sustain the finding of the jury that plaintiff was totally and permanently disabled from performing the work of either.

Defendant contends that the trial court erred in its definition of the words "in line of duty" contained in the statute. The pertinent part of the instruction was as follows: "The disability contemplated by such (pension) act does not mean a fireman must suffer an accident or some violent

injury, but includes disability from any cause which a fireman may suffer in the line of duty, and includes sickness or disease contracted in the line of duty, results of over-exertion, strain, inhalation of smoke, and results of extreme heat, which result in his permanent and total disability. The act also contemplates any blow to the body which sets in motion steps resulting in permanent and total disability." In another instruction the trial court instructed that "in order to establish that disability arose from a cause, while in line of duty, it is sufficient for the plaintiff to establish that an injury, strain, over-exertion, heat or inhalation of smoke, combined with a pre-existing condition within the plaintiff, so as to aggravate his pre-existing condition and thereby produce the disability claimed."

The applicable portion of the statute is: "In case any fireman * * * shall become permanently and totally disabled from accident or other cause, while in the line of his duty, such fireman shall forthwith be placed upon the roll of pensioned fireman, * * * ." § 2441, Comp. St. 1922. As we recently said in Mook v. City of Lincoln, 146 Neb. 779, 21 N. W. 2d 743: "The alternatives are clear. The pension is to be paid if death occurs while in the line of duty. Likewise, if death is caused by or is the result of injuries received while in the line of duty, then the pension is to be paid." The rule is the same in the case of permanent and total disability as in a death case. The words "in line of duty" mean "in the discharge of duty." Allen v. Burlington, C. R. & N. Ry. Co., 57 Iowa 623, 11 N. W. 614. That the evidence is sufficient to sustain a verdict that plaintiff became permanently and totally disabled in line of duty is amply supported by the case of Elliott v. City of Omaha, 109 Neb. 478, 191 N. W. 653. See, also, Wessel v. City of Lincoln, 145 Neb. 357, 16 N. W. 2d 476.

We think the instructions of the court correctly and fairly presented the case to the jury. The evidence when supplemented by the expert medical testimony was such that the jury could properly find that plaintiff was totally and permanently disabled and that he became disabled in

line of duty within the meaning of the Firemen's Pension Act.

AFFIRMED.

PAINE, J., participating on briefs.