71 N.J. Super. 463 (1962)
177 A.2d 304
STANLEY J. KOCHEN, PLAINTIFF-APPELLANT,
v.
CONSOLIDATED POLICE AND FIREMEN'S PENSION FUND COMMISSION, AN AGENCY OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 1961.
Supplemental Memoranda Filed November 1, 1961.
Decided January 11, 1962.
*465 Before Judges GOLDMANN, FOLEY and LEWIS.
Mr. Martin E. Kestenbaum argued the cause for appellant (Messrs. Abrams & Kestenbaum, attorneys; Mr. Norman J. Abrams, of counsel).
Mr. David A. Biederman, Deputy Attorney General, argued the cause for respondent (Mr. David D. Furman, Attorney General of New Jersey, attorney; Mr. Robert L. Sheldon, Deputy Attorney General, of counsel).
The opinion of the court was delivered by LEWIS, J.A.D.
Plaintiff, Stanley J. Kochen, had been a member of the Fire Department of the City of Plainfield for over 15 years when, on August 10, 1959, he filed an application for service-connected disability pension. The Consolidated Police and Firemen's Pension Fund Commission *466 determined that he was permanently disabled, did not qualify for service-connected retirement, and he was only entitled to nonservice disability pension payments. The agency's "Opinion, Order and Judgment" was entered February 10, 1961, from which plaintiff appeals.
The pertinent statutory language of N.J.S.A. 43:16-2 reads:
"Any member of such police or paid or part-paid fire department who shall have received permanent disability while on duty shall be retired upon a service disability pension equal to 2/3 of his average salary.
A member of any such department who shall have served honorably, desiring to retire because of permanent disability not sustained while on duty, shall upon approval of his application or the application of his employer be retired on a nonservice disability pension equal to 1/2 of his average salary. * * *" (Emphasis supplied)
The liberalizing trend of the Legislature, in its consideration of police and firemen's pension rights, has been firmly expressed over the years. The original enactment (L. 1920, c. 160, sec. 2, p. 325) provided a 1/2 average salary pension for permanent disability received "in the performance of his duty," and reference is made in the statute to "injury or disease." Later, an amendment encompassed a nonservice-connected disability with a 1/3 average salary benefit (L. 1944, c. 253, sec. 2, p. 820). In 1946, the law was changed to delete the term "in the performance of his duty," and to substitute therefor the words "while on duty" (L. 1946, c. 284, sec. 1, p. 967). Then followed legislation to equalize the retirement rates (1/2 salary) for each class without regard to service or nonservice connection (L. 1947, c. 234, sec. 2, p. 898). Lastly, the amendment, an excerpt from which we have heretofore quoted, increased the service-connected disability rate to a 2/3 average salary benefit retaining the standard "while on duty" (L. 1959, c. 159, sec. 1, p. 630). No reference is made in this amendment to injury or disease.
Upon recommendation of the city physician and after receiving a written directive from his superior officer, *467 Kochen submitted his application to be retired. He was aided by the chief of the fire department and the city clerk in the completion of the required form. In it he alleged permanent disability while on duty and, in an accompanying statement, the fire chief certified that his departmental records showed and indicated applicant's disability was sustained while on duty as a fireman.
In a supplemental declaration, on a form furnished to him, plaintiff described the nature of his incapacity as: "Inadequate venous drainage of the left leg because of varices and former thromboses and ligations of the veins, resulting from a first attack of thrombophlebitis following pleurisy and pneumonia as the result of smoke poisoning on October 8, 1949." The periods of hospitalization relating to that accident were listed.
On October 1, 1959 Kochen was informed that the retirement committee of the Commission had rejected his claim for service-connected pension. The committee had determined that the evidence was insufficient for such a classification. The agency further advised that it would honor a nonservice claim or consider further evidence associating his disability with a service incident. Plaintiff, through counsel, thereupon submitted a report from the Muhlenberg Hospital reciting information respecting the numerous admittances of Kochen as a patient between October 25, 1949 and November 6, 1959, a letter from a treating physician, Dr. Robert H. Null, and copy of a communication from the compensation insurance carrier acknowledging, by a remittance of payment, Kochen's disability claim resulting from an accident on October 26, 1958.
The Commission, in rendering its determination on December 1, 1959, recognized applicant's permanent disability, characterized as "chronic thrombophlebitis," and concluded that it was of the opinion "that there is inconclusive evidence that this condition was directly caused by an accident suffered by Mr. Kochen in line of duty." It offered only a nonservice disability retirement. Counsel informed *468 the Commission of plaintiff's intention to appeal to the Superior Court, and suggested a formal hearing in order to establish a record for appellate review. Accordingly, the Commission scheduled a hearing for February 24, 1960, which proceeded solely upon the question of causation of disability as determined from the medical testimony and plaintiff's exhibits of case histories, records, reports and correspondence. Although pensioner's original application referred only to a 1949 accident, a requested amendment was impliedly permitted to embrace all occurrences during the course of employment. The conclusions of the Commission were founded upon a plenary consideration of the total evidence adduced at the hearing.
There is no need to discuss the voluminous details connected with the numerous accidents, illnesses and events alleged to be contributing factors to plaintiff's crippling incapacity. Sufficient for this opinion that we (1) observe the highlights of the October 1949 accident; (2) mention the nature of the injuries asserted to be service-connected; and (3) consider the proffered medical opinions.

(1)
On October 8, 1949, while fighting a fire, Kochen inhaled considerable smoke and gas. His protective clothing was thoroughly soaked with water. The following day, he left on vacation for Florida, and upon arrival in Miami was taken from the train directly to the Alton Road Hospital where he was hospitalized (from October 11, 1949 to October 24, 1949) for pleurisy and pneumonia. Upon returning to New Jersey, he was admitted to the Muhlenberg Hospital, where he remained until November 1, 1949; his condition was described as "virus pneumonia, unresolved." He reported for duty at the end of that month, and within a week thereafter he was recommitted to the hospital with a severe pain in the right chest. The recorded diagnosis was: "Bursitis, acute, subdeltoid."

*469 (2)
Plaintiff commenced his services with the fire department on November 17, 1942, and continued in its employ until retirement except for an intervening period (March 31, 1944 to January 15, 1946) when, under military leave, he was with the United States Armed Forces. He experienced, over the years of employment, several injuries in the discharge of his duties as a fireman. All accidents were requested to be reported on forms furnished for that purpose, which forms were required to be filed in duplicate with the municipal clerk within three days after the accident occurrences. The municipal records reveal the following accident reports on his behalf, disclosing in summary:

 Date of accident Nature of injury Circumstances
March 12, 1946 Badly torn ligaments of Stepped into hole and fell
 the right ankle turning ankle while beating
 out grass fire
April 7, 1949 Finger burns Tar dropped on hand when
 opening door of sheds that
 were on fire
February 9, 1951 Bruise of left upper Fell astride floor beam when
 thigh second floor of burning
 building collapsed
September 7, 1955 Puncture wound in left Stepped on nail while fighting
 leg a fire
December 27, 1957 Severe coughing spell, Absorption of sulphur dioxide
 headache and slight fumes from leaking
 chest pain refrigerator which was being
 removed from cellar of
 building
September 6, 1958 Pain in lower abdomen, Occurred while pulling fire
 right side, back and hose down from tower
 down right leg
October 26, 1958 Sharp pain in both Sliding down pole at station
 ankles and heels of responding to an alarm 
 both feet landed on floor with a thud
May 8, 1959 Pain in right side of Developed while pulling hose
 groin in tower after returning from
 fire alarm

*470 An accident report for the October 1949 incident was not filed, and no explanation was offered for failure to do so other than the record of extenuating circumstances which revealed that plaintiff's illness occurred on his way to Florida, a trip commenced immediately after a fire-fighting exposure.
The Muhlenberg Hospital exhibit chronicled the admissions, diagnoses and treatments of Kochen as a patient. Its record of his last admittance is significant:
"This patient was readmitted to the Hospital on May 31, 1959 and discharged on June 4, 1959. He has a history as follows: Patient has varicose veins for a long time, particularly in the left leg. About 10 yrs. ago he had bilateral phlebitis following pneumonia that subsequently was complicated by pulmonary embolism. He had, at that time, bilateral common femoral ligation. Subsequent to that he made an uneventful recovery. He has had no further pain or discomfort in his leg. On 11/2/58 he injured his left ankle sliding down a pole. Apparently he developed an abscess. Following the relief of this abscess, it was noted that his veins were markedly dilated in this area and that an area of discoloration persisted. Because of the possibility of the further varicose ulceration, it was decided that a varicose vein excision be done.
Operation performed: 6/1/59 Ligation of the greater saphenous vein.
Final Diagnosis: Saphenous vein varicesitis, left."

(3)
Only two witnesses testified at the hearing; they were Doctors Edward C. Loizeaux and Bruce A. Carroll, who were called on behalf of plaintiff. Dr. Loizeaux was city physician for approximately five years prior to 1960; he had examined Kochen several times and was familiar with his records at the Muhlenberg Hospital. He diagnosed the patient's affliction as a "deficiency circulation, venous circulation." The doctor was unequivocal in his testimony that Kochen's disability was service-connected. Referring to the October 8, 1949 incident, he testified "I think it has a cause  it is a step in the causation of the first phlebitis of which I know." He further testified that the 1958 *471 accident (when Kochen, sliding down the pole answering an alarm, traumatized his legs) caused a thrombosis of the superficial veins in his leg, which developed into an ulcerated condition that would not respond to conservative treatment. The doctor continued:
"* * * He [Kochen] had the bad circulation before he slid down the pole. In sliding down the pole he injured the leg, and that vein, which led to an ulcer and, in curing the ulcer, Doctor Null, who works for the insurance company that handles the Plainfield Compensation, in ligating the veins of that leg, he left him so poor circulation that I advised his retirement * * *."
Dr. Bruce A Carroll, a specialist devoting 100% of his time to peripheral vascular diseases, qualified as an expert. He testified that Kochen's injury in 1946, when he tore ligaments in his ankle while fighting a grass fire, was "a perfect set-up for a thrombophlebitis, whether he developed a pulmonary embolism with it or not." The specialist explained that Kochen may have developed a phlebitis when his leg was in a cast and immobilized and "[e]ven fungus infection of the foot is a notorious cause of thrombophlebitis." Dr. Carroll entertained no doubt that plaintiff's job activities had produced symptoms resulting in his physical incapacity and opined that there are 27 causes of such a malady and that Kochen's history reveals "four very good reasons for developing a thrombophlebitis, which is service-connected."
In advance of the hearing, the Commission requested Dr. William Greifinger to submit an analytical recommendation and opinion. Its letter to the doctor stated that the problem was to identify disability with an accident suffered in the performance of a duty, stating: "It appears this question is whether the disability identified as Chronic Thrombophlebitis was caused by the severe wetting of October 8, 1949 and the onset of pneumonia and pleuorsy [sic] * * *." The doctor's report to the Commission under date of January 15, 1960 concludes:
*472 "I would agree that the association between the thrombophlebitis which occurred in 1951 and the pneumonia which occurred in 1949 is not probable. This man would have to submit evidence that this thrombophlebitis occurred immediately after his pneumonia and subsequent hospitalization for the pneumonia for his claim to be valid, in my opinion."
The nature and extent of the information furnished Dr. Greifinger upon which to base his prehearing analysis, recommendation and opinion are unknown. We note that the doctor was in attendance at the hearing and plaintiff submitted to a physical examination by him. The defendant, however, did not use the doctor as a witness and his subsequent report referred to by the Commission in its final opinion is dehors the record. While evidence outside the record may be considered, an administrative agency may not rest its ultimate determination upon undisclosed evidence. The fundamental principles of fair play demand an opportunity to test its trustworthiness and to explain or rebut it. See Elizabeth Federal S. & L. Ass'n v. Howell, 24 N.J. 488 (1957); Pennsylvania R.R. Co. v. New Jersey State Aviation Commission, 2 N.J. 64 (1949); 1 Davis, Administrative Law Treatise, sec. 7.20, p. 506 (1958). As said by our Supreme Court in Mazza v. Cavicchia, 15 N.J. 498, 516 (1954), "* * * the mind of the decider should not be swayed by materials which are not communicated to both parties and which they are not given an opportunity to controvert."
The exhibit report of Dr. Robert H. Null, physician for the compensation carrier, disclosed that he treated Kochen on November 2, 1958 for an infected left ankle, the "result of an injury sustained while sliding down the pole at Fire Headquarters," and that the infection was incised and drained. The ankle was ulcerated as a result of the infection and was treated by him until January 16, 1959. Another exhibit was the report by Dr. M.C. Williams to whom plaintiff, after filing his application for retirement, was referred by the Commission for a physical examination. The doctor's *473 filed report bears date September 9, 1959. In the history and description of disability he stated that applicant: "Has had 8-10 attacks of thrombophlebitis in left leg. Onset of trouble 10 years ago when he got pneumonia after a fire and complicated by thrombophlebitis." Dr. Williams advised retirement and diagnosed the disability as "Chronic thrombophlebitis."
Aside from the written preliminary report of Dr. Greifinger, which antedated the hearing and his medical examination of Kochen, no proof was offered to contradict, qualify or modify the testimony and conclusions of the only medical witnesses (Dr. Loizeaux and Dr. Carroll) and the factual record of exhibits that plaintiff presented to reinforce his claim. Why Dr. Greifinger did not testify and submit to cross-examination, or why Dr. M.C. Williams (the examining physician for the Commission) and Dr. Robert H. Null (a treating physician for the insurance company) did not give evidence remains unexplained. Failure to call such witnesses under the circumstances permits the inference that their testimony would not be as favorable to the defendant as desired. See Bayer v. Frank P. Farrell, Inc., 69 N.J. Super. 347, 365 (App. Div. 1961), and the authorities therein mentioned. In that case, this court also considered the probative value of medical opinions citing, among other cases, Bober v. Independent Plating Corp., 28 N.J. 160, 167 (1958).
Each side perceived the import of Cummings v. Policemen's Pension Commission, 121 N.J.L. 129 (E. & A. 1938). Plaintiff argues it is inapplicable because of the subsequent legislative amendments. Defendant maintains that the statutory wording change resulted from the fact that the legislation now embraces service-connected and nonservice-connected pensions; that Cummings dealt only with service-connected disability, as does the instant case, and that therefore "Cummings, supra, never reversed, is still good law." We point out that L. 1920, c. 160, in effect when that case was decided, necessitated permanent disability in the performance *474 of duty, and the act made reference to "injury and disease." Moreover, at that time, claimant's burden was to prove his case by a preponderance of the evidence. The amendment controlling Kochen's application (L. 1959, c. 159) adopted the standard while on duty and eliminates any mention of the words injury or disease, and the now-prevailing canons of proof require that the evidence, as a standard of persuasion, be a mere preponderance of probabilities. See Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127, 139 (1958). Probability, not certainty, is the test. Pellegrino v. Monahan McCann Stone Co., 61 N.J. Super. 561, 572 (App. Div. 1959), affirmed per curiam 33 N.J. 73 (1960). The distinguishable facts in Cummings should likewise be noted. He was a policeman when taken ill with pneumonia, which resulted in permanent disability. Cummings had served in that capacity intermittently for a period of seven years. He suffered from rheumatism, due to bad teeth and other poisons, and was addicted to much drinking, which the physicians testified might have impaired his resistance to pneumonia. There was no indication that the disease which produced his disability had its origin in exposure. The examination of the proofs convinced the court that claimant's illness and subsequent disablement were not received in the performance of his duties as a police officer. Said the Supreme Court in its opinion, which was affirmed per curiam by the Court of Errors and Appeals:
"We think it clear that the petitioner could only succeed by showing that his disability, which is admitted, arose out of his performance of duty as a policeman. The words injury and disease are used in the same connection and both relate back to the disability received in such performance above recited." (121 N.J.L., at p. 130)
As the law now stands, a pensioner in order to qualify for the 2/3 average salary benefits must establish by a preponderance of the probabilities that he sustained permanent disability while on duty.
*475 The term "while on duty" is broader in scope than "in the performance of duty." It is not essential under the Police and Firemen's Pension Act to establish that permanent disability had its origin in any particular performance, act, accident or injury; if it were sustained while on duty, the qualifying legislative standard is satisfied. It is common knowledge that firemen and members of the police force are exposed to abnormal hazards  hazards of the elements, risks of physical affliction and possible disease attending the continuing discharge of their duties. The resultant effect may not be susceptible to identification with any specific injury or accident. The statute does not require the claimant to fix a particular time, event or location. Not all pension acts are so extensive in their coverage. Compare L. 1954, c. 84, sec. 43, p. 500, N.J.S.A. 43:15A-43 (Public Employees Retirement System), and L. 1955, c. 37, sec. 39, p. 119, N.J.S.A. 18:13-112.41 (Teachers' Pension and Annuity Fund) which require that personal injuries be sustained in or from an accident arising out of and in the course of employment. It is not within the province of an administrative agency or the judiciary to challenge the wisdom of a legislative pension policy. See Beronio v. Pension Commission of Hoboken, 130 N.J.L. 620, 625 (E. & A. 1943); Garrabrant v. Pension etc., County of Essex, 24 N.J. Super. 18, 24 (App. Div. 1952).
The Commission misconceived the language and intent of the applicable legislation when it proceeded, as is evident throughout the hearing, on the premise that plaintiff had to establish the origin of his debilitating disease in an accident occurring in the course of his employment. We note during the direct examination of Dr. Carroll that one of the examiners remarked: "The law so states, that it must be an accident that is a result of a line of duty disability and not from some other external disability," to which defense counsel erroneously added: "Doctor, just to explain it. This has to be more than probabilities. That's our view of it."
*476 Defendant places reliance upon Board of Firemen's Relief and Retirement Fund Trustees of Houston v. Julius F. Marks, 150 Tex. 433, 436, 242 S.W.2d 181, 182, 27 A.L.R.2d 965 (Sup. Ct. 1951), with the comment that the similarity between the claimant in that case and Kochen, in the present case, needs no elaboration. In the Texas case, Marks, a fireman, contended he was totally disabled and applied for a pension. The request was denied on the ground that his incapacity was not a consequence of his duty as a fireman. He suffered from a hypertrophic arthritis condition. It was not disputed that he was the victim of several work-connected injuries, most of which were minor, requiring no medical attention. Of a major nature were an injury to his knee (twisted when he stepped into a hole), a rather violent injury to his wrist, and exposure on occasions to freezing or near-freezing temperatures while his clothing was soaked with water. Two doctors testified at the trial. While they were in direct conflict respecting the theories of exposure and contributory cause, they were in agreement that hypertrophic arthritis is a degenerative disease and that an arthritic condition caused by an injury does not spread to an uninjured joint. The dominant fact was that Marks had arthritis in practically all the joints of his body. His ailment was not attributable to an injured knee or wrist. There was substantial evidence to support a conclusion that claimant's crippling condition was a natural sequence in the degenerative process; and that there was no causal connection between the disease and his duties as a fireman.
In the case sub judice it appears that plaintiff was of good health when employed by the fire department, during military service, at the time of his discharge, and when he resumed civilian employment as a fireman. There was no indication of symptoms of thrombophlebitis prior to his right ankle injury in 1946. In the 1951 accident, it was his left upper thigh that was hurt. The puncture wound in 1955 was to his left leg, and in 1958 the ankles and heels of both feet were injured. The evidence is clear that *477 thrombophlebitis was localized to his lower extremities. Even if the vascular weakness in such areas was not actually brought about by a work-connected accident or accidents, his precarious condition was at least aggravated and accelerated by his daily work activities and service-connected injuries to an ultimate degree of total incapacity.
In Roth v. Board of Trustees, etc., 49 N.J. Super. 309 (App. Div. 1958), we held in construing pension legislation that the principles of the Workmen's Compensation Act should control on the issue of causal connection between an accident and death. The same would be true with relation to an accident and permanent disability. Pre-existing disease or infirmity of an employee does not disqualify a claim under the "arising out of employment" requirement of the Workmen's Compensation Act if the employment aggravated, accelerated, or combined with the disease or infirmity to produce permanent disability. 1 Larson, Workmen's Compensation Law, sec. 12.20, p. 170 (1952); 62 C.J.S. Municipal Corporations § 614e(2), p. 1276; Evans v. City of Lincoln (involving an injured fireman), 147 Neb. 163, 22 N.W.2d 565 (Sup. Ct. 1946). In Mayti v. Male, 59 N.J. Super. 478, 484 (Cty. Ct. 1960), it was said: "But the mere preexistence of a progressive disease does not bar resort to the Fund, if the total disability was effected by the concurrence of the last injury and the effects of the progressive condition or disease." See also Balash v. Harper, 3 N.J. 437, 442 (1950); Fox v. City of Plainfield, 10 N.J. Super. 464 (App. Div. 1950). Cf. Schulman v. Male, 70 N.J. Super. 234 (App. Div. 1961). Additionally, when we consider the scope of the act "there must be thrown into the scales the general tendency of the law to apply the Compensation Act in the employee's favor when in doubt." Aromando v. Rubin Bros. Drug Sales Co., 47 N.J. Super. 286, 293 (App. Div. 1957), certification denied 26 N.J. 244 (1958). But note comments of Judge Foley in Page v. Federated Metals, 71 N.J. Super. 59 (App. Div. 1961). Decisions, *478 however, must be rendered on the facts of each particular case. Mergel v. N.J. Conveyors Corp, 14 N.J. 609, 613 (1954).
It is a general rule that pension statutes are to be liberally construed to effectuate the remedial statutory intent. 3 Sutherland, Statutory Construction (3d ed. 1943), sec. 7209, p. 434; 40 Am. Jur., Pensions, sec. 4, pp. 962, 963; Angersbach v. South River Police, etc., Com., 122 N.J.L. 1, 3 (Sup. Ct. 1939). Liberal construction resolves all reasonable doubts in favor of the applicability of the statute to the particular case. McCaffrey, Statutory Construction, sec. 72, p. 145 (1953), citing Black, Construction and Interpretation of the Laws (2d ed. 1911), p. 444.
Any innuendo in the proceedings that plaintiff's application was inspired by the increased benefits provided by the 1959 Legislature is subject to a two-fold answer  (1) Kochen was requested by his superior, after medical recommendation of the municipal physician, to file for retirement, and (2) the act augmenting service-connected pension benefits was not adopted by the Legislature until September 8, 1959, several weeks after his application was filed.
Our function is to determine whether the evidence before the Commission furnished a reasonable basis for its action. We do not substitute judicial judgment for that of the agency administering the pension fund. Roth v. Board of Trustees, etc., supra (49 N.J. Super., at p. 314); In re West Jersey and Seashore R.R. Co., 46 N.J. Super. 543 (App. Div. 1957); Elizabeth Federal S. & L. Ass'n v. Howell, supra (24 N.J., at p. 508); Holly v. Bates, 7 N.J. 191 (1951). We are mindful of the substantial evidence rule and the important limitation it imposes upon the power of the courts to overturn a decision of an administrative agency. A study of the instant record and the pension statute, however, leads us to the firm conclusion that plaintiff's tendered hypothesis of causal relation between *479 his employment and permanent incapacity was sustained by a preponderance of the probabilities. There was abundant evidence of service-connected disability. No testimony was offered to support the findings of the Commission, and the evidence of nonservice incapacity was far too minuscule to be considered substantial and to deprive claimant of the larger pension benefits to which he is entitled.
Reversed for the reasons stated.